Joseph H. Malley (TX State Bar No. 12865900)
Law Offices of Joseph H. Malley P.C.
1045 North Zang Blvd
Dallas, Tx 75208
Telephone: (214) 943-6100
Facsmile:   (214) 943-6170
malleylaw@gmail.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ARTHUR LOPEZ, and MARK LANING, individually, and on behalf of a themselves and all others similarly situated individuals,<br><br>Plaintiffs,<br><br>V.<br><br>CROSS-SELL, L.L.C., a Kentucky Corporation, NORTH AMERICAN VEHICLE INSURANCE SPECIALISTS, L.L.C., d/b/a NAVISS, a Missouri Corporation, and Doe Individuals and Corporations 1-100 inclusive,<br><br>Defendants. | **CLASS ACTION COMPLAINT**<br><br>JURY DEMAND<br><br>COMPLAINT FOR:<br><br>Violations of the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq. |

**COMPLAINT—CLASS ACTION**

Plaintiffs, Arthur Lopez, and Mark Laning; individually, and on behalf of themselves and all others similarly situated individuals, by and through their attorney, Joseph H. Malley, with the Law Offices of Joseph H. Malley, P.C., move for as and for their complaint, and demanding trial by jury, allege as follows upon information and belief, based upon, *inter alia*, investigation conducted by and through their attorney, which are alleged upon knowledge, bring this legal action against Defendants Cross-Sell, L.L.C., North America

Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and Doe Individuals and Corporations 1-100 inclusive. Plaintiffs' allegations as to themselves and their own actions, as set forth herein, are based upon their personal knowledge, and all other allegations are based upon information and belief pursuant to the investigations of counsel. Based upon such investigations, Plaintiffs believe that substantial evidentiary support exists for the allegations herein, or that such allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

The true names and capacities, whether individual, corporate, associate, director, officer, agent, its employees, officers, directors, legal representatives, heirs, assigns, successors, individual or corporate entities acting within a partnership, joint venture, trust, association, union, subsidiaries, whether wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which it exercises supervision or control, or group of individuals associated in fact, although not a legal entity, or other legal entity, of each of the Defendant Doe Individuals and Corporations 1-100 inclusive, (hereinafter referred collectively to as "Doe"), are unknown to Plaintiffs at this time and therefore Plaintiffs sues Doe by such fictitious names. Plaintiffs will ask leave of the Court to amend this complaint to show the true names and capacities of Doe when that information is ascertained. Plaintiffs are informed and believe, and thereon alleges, that each of the Defendants designated herein as Doe are legally responsible in some manner for the performance of the acts and omissions described below, and are liable for the events and happenings alleged, and in such manner, proximately caused harm to Plaintiffs as further alleged.

Defendants Cross-Sell, L.L.C., North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and Doe Individuals and Corporations 1-100 inclusive, and each of them, are individually sued as participants, co-conspirators, and aiders and abettors in the improper acts, plans, schemes, and transactions, including but not limited to acts, whether individual, corporate, associate, director, officer, agent, its employees, officers, directors, legal representatives, heirs, assigns, successors, individual or corporate entities acting within a partnership, joint venture, trust, association, union, subsidiaries, whether wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which it exercises supervision or control, or group of individuals associated in fact, although not a legal entity, or other legal entity, of each of the Defendants, that are the subject of this complaint.

## I.
## NATURE OF ACTION

1. Plaintiffs bring this consumer Class Action lawsuit pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), on behalf of themselves and a proposed class of similarly situated Individuals, (hereinafter referred to as "Class Members"), who were victims of unfair, deceptive, and unlawful business practices; wherein their privacy and security rights, were violated by Defendants Cross-Sell, L.L.C., (hereinafter referred individually to as "Cross-Sell"), that acted independently, and knowingly authorized, directed, ratified, approved, acquiesced, or participated, in conduct made the basis of this class action, acting in a capacity best described colloquially to as a

"Supplier," acting independently, and in concert, with Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS ,(hereinafter referred to as "NAVISS-"), and Doe individuals and Corporations 1-100 inclusive, (hereinafter referred individually to as "Doe"), and collectively referred to as "Cross-Sell Affiliates", and each knowingly authorized, directed, ratified, approved, acquiesced, or participated, in conduct made the basis of this class action, in a capacity best described colloquially to as "Distributors", in acts that include one (1) or more of the following:

1. Obtain, Plaintiffs' and Class Members' Motor Vehicle Records, (hereinafter referred to as MVRs"), from State Motor Vehicle Departments, without their express consent, for purposes that violated the Driver's Privacy Protection Act (hereinafter referred to as "DPPA");

2. Re-disclose, directly or indirectly, Plaintiffs' and Class Members' MVRs, without their express consent, for purposes that violated the DPPA;

3. Re-sell, directly or indirectly, Plaintiffs' and Class Members' MVRs, without their express consent, for purposes that violated the DPPA.

2. The nature of this action includes a sequence of events, each which violates the DPPA individually and collectively, wherein:

a. Defendant Cross–Sell, L.L.C., obtained Plaintiffs' and Class Members' motor vehicle records from State Motor Vehicle Departments, for direct marketing, without authorization and express consent, in order to perpetuate fraudulent activity that violated the Federal Driver Privacy Protection Act, perpetuating such activity in a heedless, willful, and wanton manner, knowingly disregarding the safety and privacy of Plaintiffs and Class Members;

b. Defendant Cross–Sell, L.L.C., intentionally, or in the alternative, negligently re-disclosed and/or resold Plaintiffs' and Class Members' motor vehicle records from

State Motor Vehicle Departments to Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and Cross-Sell Affiliates, for direct marketing, without their authorization and express consent, in order to perpetuate fraudulent activity that violated the Federal Driver Privacy Protection Act perpetuating such activity in a heedless, willful, and wanton manner, knowingly disregarding the safety and privacy of Plaintiffs and Class Members, and on occasions, acting, or omitting to act, in a negligent manner, (*Gordon v. Softech Int'l, Inc.,* U.S., No. 13-533, *cert. den.* 1/13/14; *Arcanum Investigations, Inc. v. Gordon,* U.S., No. 13-539, *cert. den.* 1/13/14);

c. Defendants acted independently, and in concert, and each knowingly authorized, directed, ratified, approved, acquiesced, or participated, in conduct made the basis of this class action. Defendants obtained Plaintiffs' and Class Members' MVRs to use, process, store, re-disclose, resell, and purchase Personal Identifying Information, derived in whole or part, from Plaintiffs' and Class Members' MVRs, maintained by the State Motor Vehicle Department in acts which include, but are not limited to, conducting, aiding and abetting, assisting, facilitating, participating in a pattern of conduct, an enterprise affecting interstate commerce, including as a direct market provider of MVRs, to market and solicit, directly or indirectly, Plaintiffs and Class Members, without their express consent.

d. Plaintiffs suffered an injury in fact, an invasion of a legally protected interest which was concrete and particularized, a harm that was actual or imminent.

3.   On information and belief, each Defendant used additional parties to commit such acts, made the basis of this action, individually and jointly, both intentionally and

negligently, in whole or part, acting as a direct, or contributory party, to the action made the basis of this action. Pending discovery of such affiliates' involvement, acts complained of, and made the basis of this complaint, Plaintiffs will amend the complaint to include such parties.

## II.
## PARTIES

4.  Plaintiff Arthur Lopez is an individual residing in Dallas County, Texas, and is a licensed and registered driver in the State of Texas. Plaintiff Lopez's motor vehicle records, includes name, address, VIN number, vehicle type, make, model, year, and license plate number. Plaintiffs Lopez's motor vehicle records were obtained by Defendant Cross-Sell L.L.C., then re-disclosed and/or resold to Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and/or Cross-Sell Affiliates for purposes that included direct marketing use, which resulted in a direct marketing letter being sent to Plaintiff Arthur Lopez by Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, without his express consent.

5.  Plaintiff Mark Laning is an individual residing in Dallas County, Texas, and is a licensed and registered driver in the State of Texas. Plaintiff Laning's motor vehicle records, includes name, address, VIN number, vehicle type, make, model, year, and license plate number. Plaintiffs Laning's motor vehicle records were obtained by Defendant Cross-Sell L.L.C., then re-disclosed and/or resold to Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and/or Cross-Sell Affiliates for purposes that included direct marketing use, which resulted in a direct marketing letter being

sent to Plaintiff Mark Laning by Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, without his express consent.

6. Defendant Cross-Sell L.L.C., a Kentucky Limited Liability Corporation, does business within this State, was doing business within this State during the Class Period, and may be served with process by serving its registered agent: C T CORPORATION SYSTEM 306 W. Main Street, Suite 512, Frankfort, Kentucky, 40601. Defendant Cross-Sell L.L.C., is a wholly owned subsidiary of Dominion Enterprises L.L.C.. Upon information and belief, its principle place of business is 2265 Harrodsburg Rd. Suite 401, Lexington, Kentucky, 40504.

7. Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, a Missouri Limited Liability Corporation, does business in Texas, albeit not authorized to do business in Texas, was doing business within this State during the Class Period, and who may be served with process by serving the Texas Secretary of State at Citations Unit, P.O. Box 12079, Austin, Texas 78711-2079.  Clayton Logomasini, David Simpson, and Jason Chrisco were the company's principals. In July 2014, NAVISS added a new partner, Rick Podhorn, who reportedly owned 75% of the company. Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, has done business as VSC Services 101, L.L.C., VSC Administration Services Center, and Warranty Consultants Groups, L.L.C., incorporating the following Missouri companies: NAVISS, Charter Number: X01009800,  formed 11/10/09; NAVISS L.L.C., Charter Number: LC1017292, formed 12/10/09; naviss, Charter Number: X01025437,  formed 1/8/10, and NAVISS L.L.C., Charter Number: LC1038397,  formed 2/25/10. Upon information and belief, its principle place of business is 10176 Corporate Square Drive, Suite 240 St. Louis,

Missouri 63132.

**III.**
**JURISDICTION AND VENUE**

8. This Court has jurisdiction over the subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331.

9. This Court has jurisdiction over Defendant Cross-Sell L.L.C., a corporation operating in the State Of Texas, doing business in Texas.

10. This Court has jurisdiction over Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, a corporation operating in the State Of Texas, doing business in Texas.

11. Plaintiff Lopez is a citizen and resident of Dallas County, Texas, and asserts and claims on behalf of a proposed class whose members are domiciled throughout the fifty states and the U.S. territories. There is minimal diversity of citizenship between proposed Class Members and Defendants.

12. Plaintiff Laning is a citizen and resident of Dallas County, Texas, and asserts and claims on behalf of a proposed class whose members are domiciled throughout the fifty states and the U.S. territories. There is minimal diversity of citizenship between proposed Class Members and Defendants.

13. This court has Federal question jurisdiction as the complaint alleges violations of the following:

  a) Violations of the Driver's Privacy Protection Act, 18 U.S.C. §2721, et. seq.

b)

14. Subject-matter jurisdiction exists in this Court related to this action pursuant to 28 U.S.C. § 1332. The aggregate claims of Plaintiffs and the proposed Class Members exceed the sum or value of $5,000,000.00.

15. Venue is proper in this District, and vests jurisdiction in the State of Texas and Federal Courts in this district, under 28 U.S.C. §1391(b) and (c) against Defendants. A substantial portion of the events and conduct giving rise to the violations of law complained of herein occurred within this state, and within this district. Thus, mandatory jurisdiction in this U.S. District Court vests for any Class Member, wherever they reside, which occurred within the United States. The application of the law should be applied to any Class Member, made the basis of this action, anywhere within the United States, as if any and all activity occurred entirely in Texas and to a Texas resident. Thus, citizens and residents of all states are Class Members, for all purposes related to this instant Complaint, similarly situated with respect to their rights and claims as Texas residents, and therefore are appropriately included as Class Members, regardless of their residency, or wherever the activity occurred made the basis of this action.

16. Minimal diversity of citizenship exists in this action, providing jurisdiction as proper in the Court, since Defendants conducted activity within this state and in this district during the class period, and Plaintiffs include citizens and residents of this state and district, and assert claims on behalf of a proposed class whose members are scattered throughout the fifty states and the U.S. territories; thus there is minimal diversity of citizenship between proposed Class Members and the Defendants.

17. This is the judicial district wherein the basis of the conduct complained of herein involving the Defendants was implemented, in whole or part.  Motor vehicle records were obtained from this state and used within the state and district; therefore evidence of conduct as alleged in this complaint is located in this judicial district.

**IV.**
**DRIVER'S PRIVACY PROTECTION ACT 18 U.S.C. §2721 et seq.**

18. With the advancement of information technology in the 1980's a threat to privacy arose from the nonconsensual dissemination of personal information, and Congress sought to regulate particular private sectors. The highly publicized 1989 murder of actress Rebecca Schaeffer brought to light the potential threat to privacy and safety posed by this commerce in motor vehicle record information. Schaeffer had taken pains to ensure that her address and phone number were not publicly listed. Despite those precautions, a stalker was able to obtain her home address through her state motor vehicle records. Evidence gathered by Congress revealed that the incident involving Rebecca Schaeffer was similar to many other crimes in which stalkers, robbers, and assailants had used state motor vehicle records to locate, threaten, and harm victims. Based on evidence about threats to individuals' privacy and safety from misuse of personal information in state motor vehicle records, Congress enacted the DPPA to restrict the disclosure of personal information in such records without the consent of the individual to whom the information pertains.

19. To protect the privacy and safety of licensed drivers, and to limit misuse of the information contained in these government record systems, Congress enacted the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§2721-2725. The Act imposed strict

rules for collecting the personal information in driver records, and provided for liability in cases where an individual or corporation improperly collects, discloses, uses, or sells such records. Congress paid particular attention to differences between motor vehicle records and other public records containing similar information, which it decided not to regulate. One concern that motivated enactment of the DPPA was that personal information in motor vehicle records, including names and addresses, is associated with license plate numbers, which drivers must display to the general public:

"Unlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and address[es] from strangers, and this limit their access to personal identifiable information" in other records".

140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); ibid. (statement of Rep. Moran).

20. Congressional testimony in 1993 highlighted potential threats to privacy and personal safety from disclosure of personal information held in state DMV records.

Representative Moran noted in part:

"Balancing the interests of public disclosure with an individual's right to privacy is delicate, but essential, task for government. The Driver Privacy Protection Act (H.R. 3365), which I introduced last week, safeguards the privacy of drivers and vehicle owners by prohibiting the release of personal information—including a person's name and address—to anyone without a specific business-related reason for obtaining the information. This bill by itself will not stop stalking. But it will stop State government from being an accomplice to the crime".

LEGISLATION TO PROTECT PRIVACY AND SAFETY OF LICENSED DRIVERS—H.R. 3365 (Extension of Remarks- November 03, 1993) [Page: E2747]," HON. JAMES P. MORAN in the House of Representatives, WEDNESDAY, NOVEMBER 3, 1993, (last accessed September 27, 2013).

21. The testimony before Congress also discussed concerns that the personal information contained in state DMV records had considerable commercial value. In particular, the

personal information sold by state DMVS were being used extensively at that time to

support the direct-marketing efforts of businesses. See 1994 WL 212836 (Feb. 3, 1994)

(statement of Richard A. Barton, Direct Marketing Association) ("The names and

addresses of vehicle owners, in combination with information about the vehicles they

own, are absolutely essential to the marketing efforts of the nation's automotive

industry."). Personal information in DMV records "is combined with information from

other sources and used to create lists for selective marketing use by businesses,

charities, and political candidates." 140 Cong. Rec. H2522 (daily ed. Apr. 20, 1994)

(statement of Rep. Moran) ("Marketers use DMV lists to do targeted mailings and

other types of marketing.").

22. Professor Mary Culnan testified that privacy concerns about the use of information

"are especially likely to arise when the reuse is not compatible with the original

purpose for collecting the information," since in such circumstances "the prospect of

misinterpretation or crass exploitation usually follows." 1994 WL 212834 (Feb. 3,

1994) (citation omitted). Professor Culnan further explained:

"DMV information is not collected voluntarily. Few people can survive without a
driver['.]s license or an automobile, and a condition of having either is to register with the
state. By providing this information to marketers without providing an opt-out to its
citizens, the state is essentially requiring people to participate in direct marketing absent
any compelling public safety argument. This is in direct contrast to most of the other
mailing lists based on private sector data, such as a list of subscribers to a particular
magazine. The people on these lists have indicated an interest in participating in direct
marketing because they have "raised their hands" in the marketplace by voluntarily
responding to a commercial offer of some type. No such claim may be made for all licensed
drivers and registered automobile owner[s]."

23. Due to the concerns regarding the improper uses of motor vehicle records by the

marketing industry, the DPPA, initially enacted in 1994, was amended in 1999 to

change the law to eliminate the practice of selling personal information. Senator Shelby, the principal sponsor, warned against "unrelated secondary uses" of motor vehicle information without prior approval (i.e., for commercial sale in the open market), when the records have been obtained only for the purpose of vehicle registration. Senator Shelby underlined that the purpose of the DPPA was to ensure that individuals must "grant their consent" before the state or a third party can sell or release highly restricted personal information "when it is to be used for the purpose of direct marketing, solicitations, or *individual look-up*." *4 Hrg. Before the Subcomm. on Transp. of the S. Comm on Appropriations, 106th Cong.* (2000) (statement of Sen. Shelby, Sponsor), available at 2000 WL 374404.

24. The "opt-out" provisions of the original version of the DPPA was changed to "opt-in" provisions in §§2721(b)(11) and (12) by the October 1999 amendments to the DPPA. See Pub. L. No. 106-69, 113 Stat. 986 (Oct. 9, 1999). Personal information in motor vehicle records could now be disclosed in certain circumstances for bulk distribution for surveys, marketing, or solicitation, but only if individuals are provided an opportunity, in a clear and conspicuous manner, to block such use of information pertaining to them. 18 U.S.C. §2721(b)(12).

25. The DPPA defines "personal information" as "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name address (but not the five (5) digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. §2725(3). "[M]otor vehicle record" is defined as "any record that pertains to a motor vehicle operator's permit,

motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. §2725(1). The DPPA's general prohibition on disclosure of personal information is subject to fourteen (14) exceptions—the permissible purposes—which allow for the limited disclosure of personal information.

26. The 14 permitted uses of DMV data are designed to "strik[e] a critical balance between an individual's fundamental right to privacy and safety and the legitimate governmental and business needs for th[e] information." 140 Cong. Rec. 7925 (1994) (remarks of Rep. Moran). The DPPA never explicitly lists any prohibited uses; rather, it generally prohibits all but the fourteen permissible uses enumerated in section 2721(b). The fourteen permissible uses under the DPPA are:

(1) For use by any government agency, including any court or law enforcement agency, in carrying out its functions, or any private person or entity acting on behalf of a Federal, State, or local agency in carrying out its functions.

(2) For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities, including survey research; and removal of non-owner records from the original Owner records of motor vehicle manufacturers.

(3) For use in the normal course of business by a legitimate business or its agents, employees, or contractors, but only-

(A) to verify the accuracy of personal information submitted by the individual to the business or its agents, employees, or contractors; and

(B) if such information as so submitted is not correct or is no longer correct, to obtain the correct information, but only for the purposes of preventing fraud by, pursuing legal remedies against, or recovering on a debt or security interest against, the individual

(4) For use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency or before any self-regulatory body, including the service of process, investigation in anticipation of litigation, and the execution or enforcement of judgments and orders, or pursuant to an order of a Federal, State, or local court.

(5) For use in research activities, and for use in producing statistical reports, so long as the personal information is not published, re-disclosed, or used to contact individuals.

(6) For use by any insurer or insurance support organization, or by a self-insured entity, or its agents, employees, or contractors, in connection with claimed investigation activities, antifraud activities, rating or underwriting.

(7) For use in providing notice to the owners of towed or impounded vehicles.

(8) For use by any licensed private investigative agency or licensed security service for any purpose permitted under this subsection.

(9) For use by an employer or its agent or insurer to obtain or verify information relating to a holder of a commercial driver's license that is required under chapter 313 of title 49.

(10) For use in connection with the operation of private toll transportation facilities.

(11) For any other use in response to requests for individual motor vehicle records if the State has obtained the express consent of the person to whom such personal information pertains.

(12) For bulk distribution for surveys, marketing or solicitations if the State has obtained the express consent of the person to whom such personal information pertains.

(13) For use by any requester, if the requester demonstrates it has obtained the written consent of the individual to whom the information pertains.

(14) For any other use specifically authorized under the law of the State that holds the record, if such use is related to the operation of a motor vehicle or public safety. 18 U.S.C. §2721(b).

27. Sections 2721(a) and 2722(a) make nondisclosure of personal information the default

rule. See 18 U.S.C. § 2721(a) ("In general" prohibiting disclosure of personal

information "except as provided in subsection (b)"); 18 U.S.C. § 2722(a) ("It shall be

unlawful for any person knowingly to obtain or disclose personal information . . . for

any use not permitted under section 2721(b) of this title."). Section 2721(b) then lists

fourteen discrete exceptions to non-disclosure.

28. According to section 2721(c), "[a]n authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or re-disclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b)(11) or (12)). An Authorized Recipient under (b)(11) may resell or re-disclose personal information for any purpose. An Authorized Recipient under section (b)(12) may resell or re-disclose personal information pursuant to subsection (b)(12)." 18 U.S.C. § 2721(c).

29. Any person who receives personal information from a DMV and resells or further discloses that information must, for five (5) years, maintain records identifying each person or entity to whom a further resale or re-disclosure was made, and the permitted purpose for such resale or re-disclosure. See 18 U.S.C. 2721(c) (fourth sentence) (1994 & Supp. III 1997).

30. The DPPA creates a private right of action for "the individual" whose personal information was knowingly obtained, disclosed, or used "for a purpose not permitted" under section 2721(b). 18 U.S.C. § 2724(a). "It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for *any* use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a).

31. The DPPA expressly provides for liquidated damages independent of showing actual damages, where all damages are subject to the Court's discretion. The remedy for a violation of the DPPA is unambiguous under the plain terms of the statute. In *Kehoe v. Federal Bank & Trust*, the Eleventh Circuit held, based on the unambiguous language of the DPPA, which actual damages are not necessary in order to recover under the liquidated damages provision of the DPPA. 421 F.3d 1209, 1212 (11th Cir. 2005) (citing

*Doe v. Chao,* 540 U.S. 614 (2004)). The DPPA remedies are as follows:

  (b) Remedies.--The court *may* award--
  (1) Actual damages, but not less than liquidated damages in the amount of $2,500;
  (2) Punitive damages upon proof of willful or reckless disregard of the law;
  (3) Reasonable attorneys' fees and other litigation costs reasonably incurred; and
  (4) Such other preliminary and equitable relief as the court determines to be appropriate.

32. The Congressional record is clear: the core of the DPPA is to prevent the unauthorized obtainment of a citizen's personal information and the statute creates a tangible right to have one's information secure. The violation of that security is a harm that supports standing. "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda v. Nebraska*, 410 U.S. 614, 617 n.3 (1973); furthermore, "The actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing …." *Warth v. Seldin*, 422 U.S. 490, 500 (1975),

   "It boils down to this: we have doors on our homes so that outsiders who seek entry must knock and ask our permission to enter. When we want such people to come in, we invite them. When we do not want them in, they are not permitted to enter. Doors provide us with the means to control our interaction with American citizens should have the power to put 'doors' on all aspects of their private lives and to expect that anyone who wants to enter must seek and gain consent. other people."

   Hrg. Before the Subcomm. on Transp. of the S. Comm. On Appropriations, 106th Cong. (2000) (statement of Sen. Shelby, Sponsor), available at 2000 WL 374404.

## V.
## PLAINTIFF'S OCCURRENCES, HARM, AND STANDING

### A. PLAINTIFFS' OCCURRENCES

33. Plaintiffs ("Plaintiffs") are United States residents that have experienced the same occurrences as each and every Plaintiff named herein. Class Members are United States residents that experienced the same occurrences as Plaintiffs:

a.  Plaintiffs registered a motor vehicle with the State Motor Vehicle Department within their state during the Class Period. Plaintiffs were legally obligated to provide personal and sensitive identifying information within the motor vehicle information provided to the State Motor Vehicle Department for purposes required by law in order to be legally able to operate their vehicle within their state, an obligation that did not require the release of such to any individual or corporation that did not possess legal rights to access their motor vehicle records;

b.  Plaintiffs' motor vehicle records were obtained by Defendant Cross-Sell L.L.C. for impermissible DPPA purposes, without notice or express consent of the Plaintiffs;

c.  Plaintiffs were unaware that Defendant Cross-Sell L.L.C. would obtain, re-disclose and/or resell their motor vehicle records for impermissible DPPA purposes. Plaintiffs could not have learned about Defendants Cross-Sell L.L.C.'s access to their motor vehicle records except through unreasonably burdensome efforts, such as those required in the investigation underlying these allegations;

d.  Plaintiffs had Defendant Cross-Sell L.L.C. re-disclose and/or re-sell their motor vehicle records, intentionally, or in the alternative, negligently, to Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and/or Cross-Sell Affiliates, for impermissible DPPA purposes;

e.  Plaintiffs had Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and/or Cross-Sell Affiliates, obtain their  motor vehicle records

from Defendant Cross-Sell L.L.C., knowing the source of the Plaintiffs' motor

vehicle records was the State Motor Vehicle Department;

f.   Plaintiffs had Defendant North America Vehicle Insurance Specialists, L.L.C.,

d/b/a NAVISS, and Cross-Sell Affiliates use their motor vehicle records, in

whole or part, for purposes which included direct marketing;

g.   Plaintiffs received a direct marketing letter from Defendant North America

Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS,, using data derived, in

whole or part, from Plaintiffs' and Class Members' motor vehicle records

obtained by Defendant Cross-Sell L.L.C.;

h.   Plaintiffs became the victims of privacy and security violations due to

Defendants' unauthorized access to, and use of, their motor vehicle records,

suffering harm, and seek monetary and injunctive redress.

i.   Plaintiffs  requires permanent injunctive relief because Defendant's violation of

the DPPA is ongoing and, without the Court's intervention, will continue even if

the Court were to award a money judgment for past instances of DPPA

violations to Plaintiffs, but will do nothing to protect plaintiffs' rights going

forward.

**B.   PLAINTIFFS' HARM**

34. Plaintiffs have suffered an Injury In Fact-that was "concrete and particularized",

and "actual or imminent, not conjectural or hypothetical." as a result of the

Defendant's unauthorized obtainment, re-disclosure, and/or resale of Plaintiffs'

motor vehicle records, obtained without express consent, from state motor

vehicle departments for uses that included direct marketing, a violation of the

Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq., Defendants, individually

and collectively, caused  Plaintiffs "Tangible" and "Intangible" harms, including but

not limited to, the following:

1. **Violation of the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq.**

35. Plaintiffs suffered an injury in fact because Defendants violated a "legally protected

privacy interest", protected by the Driver's Privacy Protection Act, 18 U.S.C. §2721 et

seq., resulting in an Injury In Fact-that was "concrete and particularized", and "actual or

imminent, not conjectural or hypothetical, resulting in tangible and intangible harms

mentioned herein.  Plaintiffs' injury in fact was due to the taking, and public disclosure

of Personal Identifying Information contained within Plaintiffs' motor vehicle records.

The private affairs of the Plaintiff include the contents of their motor vehicle records.

This information is especially private because it reveals an individual's name, address,

and their motor vehicle information, which should not be publicly disclosed such

information that reasonable people ordinarily understand to be private, as well as in

intrusion into their private matters. Plaintiffs' motor vehicle records are not a matter of

legitimate public concern. Therefore, Defendants surreptitiously obtaining Plaintiffs'

private motor vehicle records held by State Department of Motor Vehicle Departments

for purposes that include direct marketing is, and will continue to be, regarded as highly

offensive and objectionable and a violation of the Driver's Privacy Protection Act, 18

U.S.C. §2721 et seq., due to one (1) or more of the following acts:

    a.   Obtainment of Plaintiffs' and Class Members' Motor Vehicle Records
from State Motor Vehicle Departments, without their express
consent, for purposes that violated the Driver's Privacy Protection Act

(hereinafter referred to as "DPPA");

    b.  Re-disclosure, directly or indirectly, Plaintiffs' and Class Members' MVRs, without their express consent, for purposes that violated the DPPA; and

    c.  Re-sale, directly or indirectly, Plaintiffs' and Class Members' MVRs, without their express consent, for purposes that violated the DPPA.

### 2. Informational Injury

36. Plaintiffs suffered an injury in fact because Defendants failed to provide information as required including, but not limited to, the following:

    a. Defendant Cross-Sell L.L.C. had a legal obligation to inform the State Department of Motor Vehicles and Plaintiffs that the motor vehicle records it was obtaining would be used, directly or indirectly, for direct marketing. The failure to provide this information injured Plaintiffs;

    b. Defendant Cross-Sell L.L.C. had a legal obligation to inform the State Department of Motor Vehicles and Plaintiffs that the motor vehicle records it was obtaining would be re-disclosed and/or re-sold, directly or indirectly, to Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and CarSafe, entities known to be in the direct marketing business. The failure to provide this information injured Plaintiffs;

    c. Defendant Cross-Sell L.L.C. had a legal obligation to inform the State Department of Motor Vehicles and Plaintiffs that the motor vehicle records it had obtained and re-disclosed and/or resold was being used for acts which violated the DPPA:

"The Purchaser shall immediately inform the State if privacy protected personal information provided to the purchaser is disclosed in violation of the DPPAs. This obligation applies whether the disclosure was by the Purchaser or a person or

entity that acquired privacy protected information from the Purchaser, directly or indirectly".

The failure to provide this information injured Plaintiffs;

   d.  Defendant Cross-Sell L.L.C. had a legal obligation requiring notice to the

      Plaintiffs, and all affected individuals, pertaining to the unauthorized use of the

      motor vehicle records it provided to Defendant North America Vehicle Insurance

      Specialists, L.L.C., d/b/a NAVISS, and CarSafe, used for direct marketing, without

      the Plaintiffs express consent. Such notice should have been done in the most

      expedient time possible and without unreasonable delay. Defendant Cross-Sell

      L.L.C. compounded this information injury by waiting four (4) additional months

      after it received notice to notify Defendant North America Vehicle Insurance

      Specialists, L.L.C., d/b/a NAVISS, and CarSafe to cease use of the motor vehicle

      records. Such notice appears to be the extent of its attempt to resolve this

      matter. Plaintiffs had the right to have notice that [their] motor vehicle records

      were being used improperly, the failure of such notice resulted in harm. The

      failure to provide this information injured Plaintiffs

**3. Lost Time, Money, and Resources**

37. Plaintiffs suffered an injury in fact because Defendants made the Plaintiffs lose time,

   money, and resources including, but not limited to, the following:

   a. Plaintiffs expended [their] time, money, and resources to provide the motor

   vehicle record information to State Motor Vehicle Departments, an obligation

   required by law. Plaintiffs expended [their] time, money, and resources with the

   understanding that such information would only be used for permissible

   purposes. Defendants obtained [their] motor vehicle record information [they]

provide[d] to the State Motor Vehicle Departments for impermissible uses,

negating Plaintiff's expenditure of [their] time, money, and resources;

b. Plaintiffs lost [their] time, money, and resources involving the receipt of the

unauthorized and unwarranted offers, Defendant's Direct Marketing letters, an

intrusion upon and occupation of the Plaintiff's property. These unwarranted offers

wasted [their] time, money, and resources, IE, by depleting limited time for Plaintiffs

to obtain, open, read, comprehend the letters, and handling such accordingly, an

interruption and distraction.

**4.  Risk of Identity Theft, Fraud, and Swindles**

38. Plaintiffs suffered an injury in fact because Defendants created a risk of identity theft,

fraud, and swindles which amounts to a material risk of harm, concrete and

particularized, imminent, and certainly impending.  Courts have held that "the risk

that Plaintiffs' personal data will be misused by … hackers … is immediate and very

real."  *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1214 (N.D. Cal. 2014).

In *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688 (7th Cir. 2015), the risk of

identity theft was sufficient to confer Article III standing because plaintiffs alleged that

data servers had already been breached. Id. at 694. That "threatened harm" therefore

"is sufficiently concrete and imminent" to satisfy Article III standing:

> "Dominion Enterprises today announced that a computer server within
> Interactive Financial Marketing Group (IMFG), a division of Dominion Enterprises
> located in Richmond, Virginia, was hacked into and illegally accessed by an
> unknown and unauthorized third party…"

> Dominion Enterprises Press Release, (last accessed June 10, 2016), online:
> http://www.businesswire.com/news/home/20080818006185/en/Dominion-
> Enterprises-Discloses-Data-Breach-Business-Division

**5. Security Risk**

39. Plaintiffs suffered an injury in fact because Defendants' unlawful disclosures created a material risk, a security risk of bodily injury and harm, if the personal information inherent within the motor vehicle records, including but not limited to, the Plaintiff's name and address was re-disclosed, intentionally or negligently, to persons that would do harm to the Plaintiffs and their family. The *Spokeo* Court specifically stated that "the risk of real harm" can "satisfy the requirement of concreteness." *Spokeo*, 136 S. Ct. at 1549. This security risk, an attributing factor for enactment of the DPPA in 1994, and amendment in 2000, poses a material risk of harm, actual, imminent, and certainly impending for Plaintiffs and their family.

**C. PLAINTIFFS' STANDING**

40. To establish Article III, § 2. Standing, a doctrine rooted in the U.S. Constitution's "case or controversy" requirement, Plaintiffs must demonstrate (1) an injury-in-fact that was "concrete and particularized", and "actual or imminent, not conjectural or hypothetical.", (2) fairly traceable to the defendants' actions, (3) that is likely to be redressed by a favorable decision. Plaintiffs have satisfied all three (3) requirements, resulting in the aforementioned tangible and intangible harms.

41. The U.S. Supreme Court's recent opinion reaffirmed in Spokeo that 'Intangible" Injuries are "Concrete" for Purposes of Article III 2. Standing where Congress Codified Established Common Law Rights, as Here, Codifying the Driver's Privacy Protection Act, 18 U.S.C. §2721, et. seq. *Spokeo*, reaffirmed the fundamental—and uncontroversial—principle that to establish injury-in-fact under Article III a plaintiff must allege "an injury that is both 'concrete *and* particularized.'" *Spokeo*, 136 S. Ct. at

1545 (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-181 (2000)) (emphasis in original). After clarifying that the "concrete" and "particularized" inquiries must be conducted separately, the Court affirmed the long-standing principle that a concrete injury can be either tangible, such as monetary loss, or *intangible*, such as a violation of one's free speech or free exercise rights. *Id*. at 1549 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993) (free exercise)).

**I. Injury In Fact-that was "concrete and particularized", and "actual or imminent, not conjectural or hypothetical."**

**a.  Plaintiff's Injuries are "Concrete", not merely a "Bare Procedural Violation"**

42. To establish the initial standard of the first element –injury in fact- Plaintiff has satisfied the "Concreteness" requirement because The Supreme Court's reaffirmed in *Spokeo* that violations of a statute protecting against "intangible" harm *can* constitute "concrete" injuries sufficient to confer Article III standing, without the need to show any further harm. 136 S. Ct. 1540, 1549 (2016). Where, as here, the interests protected by a statute have a "close relationship" to rights rooted in the common law, or where Congress has "elevate[d]" certain rights "to the status of legally cognizable injuries," violations of those interests amount to injury-in-fact. *Id*. In other words, a plaintiff in such a case ***need not*** allege any *additional* harm beyond the one Congress has identified."  *Id.* (emphasis added).

43. The Supreme Court, in evaluating whether an intangible injury is sufficiently "concrete"

to satisfy the injury-in-fact requirement, identified two important factors: history and the judgment of Congress, providing the following instructions to Courts: "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549.  'Private rights' have traditionally included rights of *personal security*, property rights, and contract rights."  *Id.* (emphasis added) (citing 1 W. Blackstone, Commentaries at *130-139). Injury to personal privacy has long provided a basis for suit in American courts. See Restatement (Second) of Torts §652A cmt. a (1977) (noting that "the existence of a right of privacy is now recognized in the great majority of American jurisdictions"); *Pavesich v. New England Life Ins. Co.*, 50 S.E. 68, 70 (Ga. 1905) ("A right of privacy . . . is therefore derived from natural law. This idea is embraced in the Roman's conception of justice . . . .); Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 198 (1890) (noting that "the common-law right to intellectual and artistic property are . . . but instances and applications of a general right to privacy.").

**1. Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq. Codifies "Concrete" Privacy Injuries that are Historically Recognized in Common Law**

44. The history of common law rights to privacy and the judgment of Congress, explicitly contemplated in the legislative histories of the respective statutes, resulted in the enactment of the Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq. to protect an individual's right to personal privacy and security, which traditionally provided a basis for a lawsuit at common law. Far from being a "Bare Procedural Violation", Defendant's conduct is the core harm contemplated that the DPPA guards against.

45.  The DPPA expressly protects and codifies fundamental privacy rights that are rooted in history and the common law. Sections 2721(a) and 2722(a) make nondisclosure of personal information the default rule. See 18 U.S.C. § 2721(a) ("In general" prohibiting disclosure of personal information "except as provided in subsection (b)"); 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of this title."). Section 2721(b) then lists fourteen discrete exceptions to non-disclosure ;furthermore, according to section 2721(c), "[a]n"authorized recipient of personal information (except a recipient under subsection (b)(11) or (12)) may resell or re-disclose the information only for a use permitted under subsection (b) (but not for uses under subsection (b)(11) or (12)). An Authorized Recipient under (b)(11) may resell or re-disclose personal information for any purpose. An Authorized Recipient under section (b)(12) may resell or re-disclose personal information pursuant to subsection (b)(12)." 18 U.S.C. § 2721(c). As such, the DPPA is a codification of well-established common law rights of privacy.

46.  As Justice Brandeis explained in his seminal article, *The Right to Privacy*, "[t]he common law secures to each individual the right of determining, ordinarily, to what extent his thoughts sentiments and emotions shall be communicated to others." Samuel D. Warren & Louis Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 198 (1890). The Second Restatement of Torts recognizes the same privacy rights through its tort of intrusion upon seclusion, explaining that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts § 652B (1977). The Supreme Court has similarly recognized the

primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right to privacy older than the Bill of Rights." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).

47. In enacting the DPPA, Congress recognized that it was codifying claims rooted in the common law: "[T]he right of privacy, the right to be left alone, and the right against unreasonable searches and seizures—the right, that is, to be personally secure—are among the most highly valued rights of an American citizen. These guarantees have been a part of Anglo-Saxon law ever since the 15th century." 114 Cong. Rec. S6194 (daily ed. May 23, 1968) (statement of Sen. Fong). Thus, there can be no doubt that the unauthorized access to Plaintiff's motor vehicle records for purposes that included direct marketing without prior consent— codified as unlawful by DPPA—amounts to a "concrete" injury that bears, at a minimum, a "close relationship" to the common law's steadfast protection of one's fundamental right of privacy.

48. The DPPA creates for Plaintiff[s] a specific, enforceable legal right, derived from common law, to expect Defendant to not gain access to [their] identifying information …contained within motor vehicle records held by State Department of Motor Vehicles [and] its violation constitutes a concrete, particularized deprivation.  Defendant violated the statute by obtaining, re-disclosing and/or re-selling Plaintiff[s'] personal information, and it deprived Plaintiff[s] of a right to which [they] [were] particularly entitled by law, constituting an injury-in-fact, acts sufficient to confer Article III, § 2. Standing.

**2. The U.S. Congress Recognized a "Concrete" Harm Related to the Unauthorized Obtainment, Re-disclosure, and Re-sale of Motor Vehicle Records Obtained from**

**State Motor Vehicle Departments By Enacting The Driver's Privacy Protection Act, 18 U.S.C. §2721 et seq.**

49. The "judgment of Congress"—which is both "instructive and important"—also confirms that the claims here satisfy Article III. *Spokeo*, 136 S. Ct. at 1549. The legislative histories of DPPA makes clear it was intended to recognize and codify the concrete harm that results from having a third party, like Defendants Cross-Sell, L.L.C., and Defendants North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS obtain, re-disclose, and/or re-sell their motor vehicle records, without express consent, for purposes that included direct marketing. The DPPA was initially passed in 1994 as part of Title XXX of the Violent Crime Control and Law Enforcement Act to govern the privacy and disclosure of personal information gathered by State Departments of Motor Vehicles.  In recommending DPPA's passage, Representative Edwards remarked:

"Unlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and address[es] from strangers, and this limit their access to personal identifiable information" in other records".

140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); ibid. (statement of Rep. Moran),  (emphasis added).

b)   The Fifth Circuit has also uniformly recognized the Congressional intent of the DPPA:

"Congress originally passed it (as an amendment to the Crime Control and Law Enforcement Act of 1994) in response to the murder of actress Rebecca Schaeffer at the hands of a stalker. 140 CONG. REC. H2518-01, H2526 (1994) (Statement of Rep. Goss). This stalker used DMV records to find Schaeffer's unlisted home address. Id. The legislative history reflects the concern for victims of crimes committed using DMV records.", *Taylor v. Acxiom Corp.,* No. 2:07cv0001, 2008 U.S. Dist. LEXIS 115940 (E.D. Tex. Sept. 9, 2008), aff'd, 612 F.3d 325 (5th Cir. 2010).

c)   In enacting the DPPA Congress's unmistakable intent was to create an express legal right prohibiting the "unauthorized access" to personal information contained within motor vehicle records held by the State Motor Vehicle Departments, (such as

Defendants Cross-Sell, L.L.C., and Defendants North America Vehicle Insurance

Specialists, L.L.C., d/b/a NAVISS unauthorized access to Plaintiff's motor vehicle

records). That privacy invasion is the precise concrete injury Plaintiff alleges here,

acts sufficient to confer Article III Standing.

**b. Injury-In-Fact- "Particularized" Requirement**

50. To establish the secondary standard of the first element –injury in fact- Plaintiffs have

satisfied the "Particularized" requirement because it affected the Plaintiffs in a

personal and *individual* manner, an injury suffered in particular, and not one suffered

by a third party or a "generalized grievance shared in substantially equal measure by

all or a large class of citizens," *Warth v. Seldin*, 422 U.S. 490, 499 (1975). The

Defendants violated *their* statutory rights, not just the statutory rights of other people,

and *their* personal interests in the privacy of *their* motor vehicle records are

individualized rather than collective. The Plaintiffs did not provide *their* express

consent to permit Defendants access to *their* motor vehicle records; furthermore,

Defendants obtained, re-disclosed, and/or resold *their individual* motor vehicle

records, while the direct marketing letters were sent to *their individual* residences.

**c. Injury-In-Fact- "actual or imminent, not conjectural or hypothetical."
Requirement**

51. To establish the secondary standard of the first element –injury in fact- Plaintiffs have

satisfied the injury was actual or imminent, not conjectural or hypothetical because

Defendant's actions had already occurred, IE, Defendant Cross-Sell Inc. had already

obtained Plaintiff's motor vehicle records from State Motor Vehicle Departments

without a DPPA permissible use, had re-disclosed and/or re-sold Plaintiff's motor

vehicle records to Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a

NAVISS, and Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a

NAVISS had actually sent direct marketing letters to Plaintiffs, and it had affected the

Plaintiffs. Such acts were actual, while other acts noted below were imminent, and

both were not "conjectural or hypothetical."

**II. Injury-In-Fact- fairly traceable to the defendants' actions**

52. To establish the standard of the second element –injury in fact-fairly traceable to the

defendants' actions, - Plaintiffs have satisfied this requirement because the

Defendant's actions made the basis of this action, revealed by a "covert"

investigation conducted by the Nebraska Department of Motor Vehicles, showed

unequivocally that Defendant Cross-Sell Inc. and Defendant North America Vehicle

Insurance Specialists, L.L.C., d/b/a NAVISS had violated the DPPA. Defendant Cross-

Sell Inc. entered into a purchase agreement with the Nebraska Department of Motor

Vehicles to obtain the Nebraska Motor Vehicle Registration database on a continuous

and repeated basis. The Nebraska Department of Motor Vehicles "seeded" the motor

vehicle records sold to Defendant Cross-Sell Inc. The identical "seeded" data was

incorporated into direct marketing letters sent by Defendant North America Vehicle

Insurance Specialists, L.L.C., d/b/a NAVISS to State Officials; furthermore, Defendant

Cross-Sell Inc. failed in its duty as a re-seller of the motor vehicle records obtained

from State Motor Vehicle Departments to confirm the DPPA permissible uses of

Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS.

**III. Injury In Fact-that is likely to be redressed by a favorable decision**

53. To establish the standard of the third element –injury in fact- that is likely to be

redressed by a favorable decision, Plaintiffs have satisfied this requirement because a

favorable decision by this Court shall provide relief permitted by the DPPA, including

an order to cease Defendant's unauthorized obtainment, re-disclosure and/or re-sale

of Plaintiffs and Class Members' motor vehicle records, a legal right provided to

injured parties within the DPPA which authorizes such redress. Plaintiffs  will further

be redressed when this Court orders permanent injunctive relief because Defendant's

violation of the DPPA is ongoing and, without the Court's intervention, will continue

even if the Court were to award only a money judgment for past instances of DPPA

violations to Plaintiffs, but would do nothing to protect plaintiffs' rights going forward.

# VI.
## STATEMENT OF FACTS

**A.**   **Introduction**





54. For all consumers that have ever been harassed by direct marketing letters selling "extended vehicle warranties" falsely advertising that your vehicle warranty had expired, wondered how these companies knew your personal information, IE., your

name and address associated with the make, model, and year of your vehicle, and had

concerns that your home address was publicly being sold and feared that your family's

security was at risk and privacy violated, this class action will identify sources used to

obtain this personal information and implement such unauthorized activities, and the

elements of a business enterprise implemented by the obtainment of  state motor

vehicle records, directly or indirectly, then re-disclosed and/or re-sold, in order to aid

and abet the direct marketing industry, acts done without the individuals' express

consent, a violation of the Driver's Privacy Protection Act ("DPPA").

55. Proof of such DPPA violations by the Defendants, the basis of this class action,

evidencing a pattern across the United States, was the result of a covert investigation

conducted by the State of Nebraska Department of Motor Vehicle Department which

"seeded" motor vehicle records sold to "Bulk Requestors", referencing persons and/or

entities that obtain the entire database of state motor vehicle records and/or obtain

all periodic updates. "BJ. Johnson, 4856 Gleneagle Ct. Lincoln Nebraska 68526-9549",

was seeded data provided by the State of Nebraska Department of Motor Vehicle

Department to Defendant Cross-Sell. L.L.C., which was then re-disclosed and/or re-

sold to Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS,

used for direct marketing, a violation of the DPPA.

56. The protections afforded consumers by the Driver's Privacy Protection Act is premised

on a screening process qualifying access to their state motor vehicle records. This

obligation is imposed on any and all individuals and entities that obtain, re-disclose,

and resell such data, imposing a duty on "Authorized Recipients", acting as re-sellers

to exercise reasonable care in responding to requests to purchase the motor vehicle

records. Individuals and entities that obtain, re-disclose, and/or re-sell the motor

vehicle records obtained from state motor vehicle departments, must follow screening

policies and reasonable verification measures. Defendant Cross-Sell L.L.C.

intentionally, or in the alternative, negligently re-disclosed and/or re-sold motor

vehicle records obtained from the State Department of Motor Vehicles to Defendant

North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and Cross-Sell

Affiliates, without adequate screening precautions.

57. The unauthorized access to State Motor Vehicle Records exists at the "cost" of the

Plaintiffs and Class Member's privacy and security, creating a reasonable fear of

present and future injury, compelling individuals to take costly and burdensome

measures to protect their privileged information from risk of access and probable

harm. Kristi Dyroff, an advocate with the National Organization for Victim Assistance,

discussed the consequences from the improper access to motor vehicle records:

Kristy Dyroff, National Organization for Victim Assistance, "DPPA fails to provide
protection for crime victims", October 30, 2013, (last accessed June 3, 2016), online:
http://www.trynova.org/category/nove-blog.

**B.  Defendants' Business Practices and Associations**

58. On information and belief, the most prevalent unauthorized use of Motor Vehicles

Records obtained from State Department of Motor Vehicles is by those persons

and/or entities involved in the Vehicle Service Contract Industry, a billion-dollar

enterprise. In order to outline the Defendant's business practices, and the incentive

for Defendant Cross-Sell, L.L.C. to act as a "supplier" to Defendant North America

Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and Cross-Sell Affiliates, an

understanding of the "VSC Industry" is necessary, including knowing the participants, and the participants' functions.

59. There are at least six (6) principal participants in a VSC Industry: (1) the consumer who purchases the VSC (the "Consumer"), (2) the dealer that markets the VSC to the consumer (the "Dealer"), (3) the administrator that develops and administers the VSC itself and is the party obligated to reimburse the cost of covered repairs (the "Administrator"), (4) the risk retention group that guarantees to pay covered claims if the Administrator does not satisfy its obligation to the Consumer (the "Insurer"), (5) the financing organization that enables the Consumer to pay for the VSC (the "Financing Organization"), and (6) "the supplier," referencing individuals and entities that supply the leads originating from sources that include obtaining state motor vehicle records.

60. The VSC Industry employs financial instruments to vertically integrate an association of entities requiring a "lead supply chain". A state's MVR database provides the most accurate and updated database of all licensed drivers and vehicles, providing a marketing database surpassing all other sources. As such, the VSC industry is involved with any and all means possible, at any costs, ignoring legal constraints, to procure this database. Once the database is obtained then the marketing and solicitation scheme can be implemented.

61. Defendant Cross-Sell L.L.C. is a corporation involved in the Direct Marketing Industry, acting as a Direct Market Provider assisting Direct Marketing entities. Reportedly, Defendant Cross-Sell L.L.C. obtains state motor vehicle records from the following states: Arkansas, California, Colorado, Florida, Iowa, Idaho, Illinois, Indiana, Kentucky,

Louisiana, Maryland, Maine, Michigan, Missouri, Mississippi, Montana, North

Carolina, North Dakota, Ohio, Tennessee, Texas, Virginia, Washington, and Wisconsin.

62. Defendant Cross-Sell L.L.C. describes its business as follows:

"The Cross-Sell Report is available in 26 states- representing approximately 70% of the country's vehicle volume. It is available in both new and used vehicle reports in most states…The Cross-Sell Report details sales by Vin, Make, Model, Owner City, Owner Zip, Seller Name, Seller Code, and Lienholder where allowed by state law."

"About Cross-Sell" (last accessed June 3, 2016),
online: https://www.cross-sell.com/about.php

63. Defendant Cross-Sell L.L.C. is division of Dominion Enterprises L.L.C., a Virginia

Corporation integrated the data within their databases:

"Cross-Sell Reports and Dominion Dealer Specialties, divisions of Dominion Dealer Solutions and industry leaders in inventory management and automotive market intelligence, have announced the integration of Cross-Sell Interactive with Dominion Inventory Manager. Cross-Sell Interactive leverages market analysis to streamline dealership inventory, identify top sells, and determine the best places for dealers to target advertising dollars…Cross-Sell Interactive provides customizable dashboard widgets, unlimited user-defined charts or graphs, market-based vehicle sales data, DMV title registration data, …"

Chris Conway, "Cross-Sell reports and Dominion Dealer Specialties Join to Provide Interactive Performance to Dealers Nationwide", (Last accessed June 3, 2016), online:  http://www.dominionenterprises.com/cross-sell-reports-dominion-dealer-specialities-join-provide-interactive-performance-dealers-nationwide/

64. Dominion Enterprises L.L.C., is a corporation involved in the Direct Marketing Industry,

acting as a Direct Market Provider assisting Direct Marketing entities. Dominion

Enterprises L.L.C., describes its business as follows:

"Dominion Enterprises is one of the largest providers of highly targeted classified advertising. Our Familiar brands are recognized from coast to coast and include For Rent, boats.com,Homes.com, and HotelCoupons.com, as well as a full complement of specialty vehicles titles including CycleTrader.com and Commercial truck Trader-all reaching

millions of consumers".

"A History of Growth & Success", (last accessed June 3, 2016), online:
http://www.dominionenterprises.com/company/history/

65. Dominion Enterprises L.L.C.  acquired Cross-Sell, Inc. on or about October 13, 2006:

"NORFOLK, Va., Oct. 13 /PRNewswire/ -- Dominion Enterprises, a leading media and information services company, today said that it has acquired Cross- Sell, Inc., Lexington, Kentucky, the country's top provider of sales data on new and used cars with 6,000 customers nationwide…

Cross-Sell sells monthly market analysis reports and tailors each report to the customer's specifications in terms of area of responsibility, competitors and vehicle type…

Auto dealers use this data to help manage inventory, focus advertising, and identify market share. In addition, media companies, financing companies and automotive consultants purchase data from Cross-Sell…"

"Dominion Enterprises Acquires Cross-Sell, Inc.". (last accessed June 9, 2016), online: http://www.thefreelibrary.com/Dominion+Enterprises+Acquires+Cross-Sell,+Inc.-a0152727659

66. On November 1, 2008, Cross-Sell, Inc., organization number 0254773, was

administratively dissolved by the Kentucky Secretary of State.

67. On February 2, 2011, Dominion Enterprises L.L.C. announced "Cross-Sell" the joint

release of the "New Market Control Analytics solution":

"The Market Control Analytics suite combines sold vehicle data with current supply data to identify the optimal used car inventory.  The toolset is designed to provide dealers with the flexibility to integrate past store experiences with real-time market data to make informed inventory management decisions."

"Cross-Sell Integrates Real-time Market Data to Deliver Complete Inventory Management Solution with Dealer Specialties", (last accessed June 9, 2016), online: http://www.autodealermonthly.com/channel/press-releases/news/story/2011/02/cross-sell-integrates-real-time-market-data-to-deliver-complete-inventory-management-solution-with.aspx

68. On February 3, 2011, Dominion Enterprises L.L.C. announced the acquisition of AVV

and @utoRevenue to reportedly form the largest provider of automotive CRM

software and services:

"Indianapolis, IN., February 3, 2011 – Autobase, the premier provider of CRM solutions for auto dealers nationwide, and a division of Dominion Dealer Solutions, today announced that sister companies, AVV ( www.avv.com ) and @utoRevenue ( www.autorevenue.com ), will unite with Autobase ( www.autobase.net), forming the automotive industry's largest and most experienced provider of CRM solutions for auto dealers."

"Autobase unites with AVV and @utoRevenue to form the largest provider of automotive CRM software and services" (last accessed June 9, 2016), online: http://www.drivedominion.com/blog/autobase-unites-avv-utorevenue-form-largest-provider-automotive-crm-software-services/

69. On February 4, 2011, Cross-Sell L.L.C. organization number 0783805, was incorporated

in Kentucky, listing its principal office as follows: 150 Granby Street, Norfolk, Virginia

23510, the headquarters of Dominion Enterprises L.L.C..

70. Defendants North America Vehicle Insurance Specialists, L.L.C, d/b/a NAVISS, a

corporation involved in the Direct Marketing Industry, acting as a Direct Market

Provider assisting Direct Marketing entities. Defendants North America Vehicle

Insurance Specialists, L.L.C, d/b/a NAVISS, describes its business as follows:

"...premier marketer of Vehicle Protection Plans in the United States. Our products and services will protect you from costly repairs, above and beyond the scope of your vehicles original manufacturer's warranty...".

VSC Administration Center, (last accessed June 3, 2016), online: http://www.zoominfo.com/s/#!search/profile/company?companyId=357627923&targetid=profile

71. Reportedly, Defendant North American Vehicle Insurance Specialists, LL.C d/b/a

NAVISS, was involved in a VSC association during the Class Period with Enterprise

Financial Group, Inc., ("EFG"), headquartered at 122 W. Carpenter 6th Floor, Irving,

Dallas County, Texas, corporations involved in the Direct Marketing Industry, acting as

a Direct Market Provider assisting Direct Marketing entities. EFG describes its business as follows:

"EFG Companies is a world-class financial services products administrator committed to developing innovating products, services and go-to market strategies across a multitude of channels. We leverage business expertise, product and process innovation on a national scale to enhance the profitability of dealers, manufacturers, and credit unions alike".

"EFG Companies", (last accessed June 3, 2016), online: https://www.linkedin.com/company/efg-companies

72. Reportedly, Defendant North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS' association with Enterprise Financial Group, Inc. occurred during the Class Period began on January 25, 2010 and ended in 2014. Defendant North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS entered into a contract with Defendant EFG agreeing to sell vehicle service contracts to customers under a service contract program, designed and administered by EFG. The association though turned litigious resulting in a pending lawsuit in a Dallas Texas Court. *Enterprise Financial Group, Inc. v North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS*, et. al. Case 3:15-cv-02036-B, US District Court, Northern District of Texas, Dallas Division, case  removed to Dallas District Court, 44th District Court, styled, *Enterprise Financial Group, Inc. v North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS*, et.al, DC-15-00923. Discovery documents filed within the case claim this association involved all of Defendant NAVISS' business, IE, "NAVISS took all of its business to EFG and was completely dependent on EFG for funding to survive".

73. Documents filed within the above referenced legal action showed that Defendant EFG had agreed to finance the marketing and advertising expenses for Defendant North

American Vehicle Insurance Specialists, L.L.C d/b/a NAVISS, administration of the vehicle service contracts, including access to Enterprise Financial Group, Inc.'s proprietary database which contains consumer data, reportedly including "prospective customers", (emphasis added) :

"As part of EFG's regular course of business, EFG aggregates certain consumer data into a proprietary, confidential, and secure database of electronically stored information containing information which includes, but is not limited to, the consumer's name, contact information, address, and limited purchase information of EFG and related products. ("Protected Intellectual Property"). This Protected Intellectual Property, which is maintained by third-party software companies, such as Moxy Solutions, Inc., is selectively and exclusively distributed to EFG sales partners, with EFG's revocable consent. Pursuant to paragraph (2)(C) of the Agreement, this Protected Intellectual Property, which includes all customer-related data, is rightfully and wholly owned by EFG at all times once a Service Contract is sold and the Seller Cost is paid to EFG on a Service Contract. EFG's Protected Intellectual Property includes all customer-related data and information electronically, magnetically, or optically stored, (Databases (e.g., Access, Oracle, SQL server data, SAP) and Contact and relationship management data (e.g., Outlook, ACT!).

74. The VSC Industry is the poster child for marketing abuses, illegal telemarketing, and deceptive mailers. It is a complex financial infrastructure, funded by a multitude of financial institutions. The core of this industry is "fueled" by illegally obtaining millions of motor vehicle records from State Motor Vehicle Departments, the "grease" to create and send the VSC marketing letters:

Georgia Department Of Law Press Release, "Governor's Office of Consumer Protection Alleges that Extended Warranty Company NAVISS Misled Consumers", *February 13, 2013,* (last accessed June 3, 2016),online: http://consumer.georgia.gov/news/press-releases/view/governor-s-office-of-consumer-protection-alleges-that-extended-warranty-company-naviss-misled-consumers

## C. **The Nebraska Department of Motor Vehicles conducted a covert investigation which found undeniable proof that Defendants Cross-Sell LLC. and NAVISS violated DPPA**

75. In an effort to investigate a response to a Request for Production in a pending Federal

Class Action, initially styled: Doe et. al. v. Compact Information Systems Inc. et al., 3:13-cv-05013-M-BH, filed in the United States District Court, Northern District of Texas, an action which had included Compact Information Systems Inc., Accudata Integrated Marketing Inc., Elizabeth M. Blank, Data Solutions Of America Inc., KMB Statistics L.L.C., and Doe Defendants, and presently styled: Cross v. Blank, Adv. No.: 9:15-ap00926-FMD, pending in the United States Bankruptcy Court for the Middle District of Florida, a Freedom Of Information Act ("FOIA") request was sent to about twenty-five (25) states, including Nebraska. The Nebraska Department of Motor Vehicles responded with a most incriminating series of documents that revealed undeniable proof of DPPA violations by Defendants Cross-Sell L.L.C, Defendant North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS, and CarSafe LLC, a company reportedly that had filed for Chapter 7 bankruptcy protection, and then dissolved the corporation in August 2014. The proof of DPPA violations was obtained by State Representatives of the Nebraska Department of Motor Vehicles.

76. Generally, State Department of Motor Vehicles' investigation to determine liability for any and all individuals and entities involved in the unauthorized obtainment, re-disclosure, and/or re-sale of motor vehicle records is a difficult process. Driver's Privacy Protection Act, 18 U.S.C. §2724(a) "sets forth the three elements giving rise to liability, i.e., that a defendant (1) knowingly obtained, disclosed or used personal information, (2) from a motor vehicle record, (3) for a purpose not permitted." Thomas v. George, Hartz, Lundeen, Fulmer, Johnstone, King and Stevens, P.A., 525 F.3d 1107, 1111 (11th Cir. 2008), Taylor v. Acxiom. Corp. 612 F.3d. 325. 5th Cir. 7/14/10. 5th Cir.  Defendant's activity satisfied all three elements giving rise to DPPA liability, (emphasis added).

77.  One (1) of the reasons that State Department of Motor Vehicles have difficulty proving

liability for DPPA violations is because the data is aggregated with other data then

redistributed to a multitude of third parties, thus any attempt to identify the initial

source of the data is near impossible. State Motor Vehicle Departments' attempting to

monitor DPPA compliance need to dissect the hypothetical "State Motor Vehicle Record

Obtainment-Direct Marketing-Distribution Network", but such attempts are curtailed

because the State DMV officials have limited choice but to accept verbatim, the Bulk

Requestor's claimed permissible DPPA uses. Another common ploy used by most Bulk

Requestors attempting to avoid detection is to claim one (1) legitimate DPPA use in

order to bypass the State Motor Vehicle Departments' screening process, then, directly

or indirectly, re-disclose and/or re-sell the data to entities without DPPA permissible

purposes. Most DPPA legal actions are based upon a high level of abstraction and mere

inferences, "Canada has provided no evidence that his personal information was

obtained, disclosed, or used for surveys, marketing, or solicitations. Canada's argument

is based upon an inference…" See Canada vs. Dominion enterprises, LTM Company

Dominion, LLC, Landmark media Enterprises, LLC., Dominion Enterprises Group, LLC,

Cross-Sell, LLC, and John Does 1-100, (W.D. Ark. 2013), 1:13-cv-01036-SOH.  An

additional factor is that the risk assumed for detection of persons and/or companies

violating DPPA is minimal, while the "rewards" for acting as a "supplier" are substantial

since State Motor Vehicle Record databases "feed" the billion dollar Vehicle Service

Contract and Auto Dealer Industry. As such, few methods exist to disprove DPPA

compliance, that is, unless the State Motor Vehicle Departments "Seed" the motor

vehicle records provide to Bulk Requestors.

78. The Nebraska Department of Motor Vehicles' Freedom of Information Act response revealed the propensity of "Cross-Sell" to violate the DPPA. "Cross-Sell Inc.", an entity which later incorporated as Cross-Sell L.L.C., Defendant in this action, had entered into a contract with the Nebraska Department of Motor Vehicles initially in 2004 to obtain its database of motor vehicle records, (**See Exhibit 1**). In 2008 the Nebraska Department of Motor Vehicles found that "Cross-Sell Inc.", had violated the DPPA and terminated the initial contract, terminating access to the State Motor Vehicle Records, (**See Exhibit 2**).

79. The Nebraska Department of Motor Vehicles agreed to permit "Cross-Sell Inc." a new contract to regain access to State Motor Vehicle Records, with additional stipulations. "Cross-Sell, Inc.", though was administratively dissolved by the Kentucky Secretary of State on November 1, 2008, and a representative of "Cross-Sell", and eventual representative of Defendant Cross-Sell L.L.C, signed the contract, Sean Conley, as "General Manager, Dominion Enterprises, d/b/a Cross-Sell, (**See Exhibit 3**).

80. During the period of this contract, Cross-Sell L.L.C. was incorporated in Kentucky on February 4, 2011, listing its principal office as follows: 150 Granby Street, Norfolk, Virginia 23510, the headquarters of Dominion Enterprises L.L.C., as opposed to the address noted on the contract signed by Conley, 190 West Lowry Lane, Suite 200 Lexington, KY 40503. The contract obligated the company to abide by the Federal Driver's Privacy Protection Act, a contract which emphasized that Defendant Cross-Sell Inc. must have DPPA permissible uses to obtain motor vehicle records; furthermore, such prohibited the disclosure and resale of the personal information unless such information is used according to specifically enumerated "permissible uses". The

contract agreed upon provided access pursuant to Driver's Privacy Protection Act, 18

U.S.C. §2721, (b)(2):

"For use in connection with matters of motor vehicle or driver safety and theft, motor
vehicle emissions, motor vehicle product alterations, recalls, or advisories, performance
monitoring of motor vehicles and dealers by motor vehicle manufacturers, and removal of
non-owner records from the original owner records of motor vehicle manufacturers".

81. In order to qualify under the "Motor Vehicle Safety and Recall Exception," the request

must be from a business involved in motor vehicle safety and recalls, preferably Auto

Manufacturers. Defendant Cross-Sell LL.C.'s disclosure and subsequent resale would have

been for a use not permitted. As such Defendant Cross-Sell, L.L.C., Defendant North

American Vehicle Insurance Specialists, LL.C d/b/a NAVISS, nor CarSafe LLC., Direct

Marketing entities, were not eligible to obtain information pursuant to the Motor Vehicle

Safety and Recall Exceptions, pursuant to the DPPA permissible uses:

**"(b)Permissible Uses.—**Personal information referred to in subsection (a) shall be disclosed for
use in connection with matters of motor vehicle or driver safety and theft, motor vehicle
emissions, motor vehicle product alterations, recalls, or advisories, performance monitoring of
motor vehicles and dealers by motor vehicle manufacturers, and removal of non-owner records
from the original owner records of motor vehicle manufacturers to carry out the purposes of titles
I and IV of the Anti Car Theft Act of 1992, the Automobile Information Disclosure Act (15 U.S.C.
1231 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), and chapters 301, 305, and 321–331 of
title 49, and, subject to subsection (a)(2), may be disclosed as follows:…

**(2)**For use in connection with matters of motor vehicle or driver safety and theft; motor vehicle
emissions; motor vehicle product alterations, recalls, or advisories; performance monitoring of
motor vehicles, motor vehicle parts and dealers; motor vehicle market research activities,
including survey research; and removal of non-owner records from the original owner records of
motor vehicle manufacturers."

82. Reportedly, the Nebraska Department of Motor Vehicles had implemented a

compliance procedure to determine if any person or company obtaining motor vehicle

records were using such for impermissible purposes, a procedure which involved

inserting test records with "seeded" data; hereinafter referred colloquially to as "fake

MVRs", a procedure to insert the test records into the files that were provided to any and all Bulk Requestors of motor vehicle records, essentially to "track" motor vehicle records obtained by Bulk Requestors, without their notice. Each Bulk Requestor was individually assigned "fake MVRs", which included "fake" names, vehicle info, VIN numbers, and bank lien information. This assignment of specific fake MVR data would allow a mechanism to confirm improper uses. A valid address was used in order for State Officials to receive any direct marketing. Upon receipt by a State Official, such letters would be correlated to its original source, thus identifying individuals and entities involved in associated phases of the motor vehicle records distribution. The "seeded" data provided to "Cross-Sell Inc. dba Defendant Cross-Sell L.L.C., included but not limited to, the following: BJ Johnson, 4856 Glen eagle Ct, Lincoln, NE  68526093630244572006  Nissan Murano SE/SL/SJN8AZ08W56W944745 White GP 39546 Actual RUP 97612P361692 CO PEELS AUTO INC., LaVista, NE 6812812/29/200912/15/2009 Lincoln Bank & Trust PO Box 94450 Lincoln, NE 6852612/29/200912/2009. The Direct marketing letter sent by Defendant Naviss had such seeded data within the letter, (**See Exhibit 4**).

83. Unbeknownst to Defendant Cross-Sell L.L.C., Defendant North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS, or CarSafe L.L.C., representatives from the Nebraska Department of Motor Vehicles were monitoring any unauthorized use of the motor vehicle records provided to Defendant Cross-Sell L.L.C., as well as other Bulk Requestors, including but not limited to, receipt of direct marketing letters derived in whole or part from the seeded data. This investigation resulted in representatives of the Nebraska Department of Motor Vehicles involved in the investigation being sent

direct marketing letters from Defendant North American Vehicle Insurance Specialists, L.L.C d/b/a NAVISS, and CarSafe L.L.C., and information within the direct marketing letters was data derived, in whole or part, from seeded data provided to Defendant Cross-Sell L.L.C., (**See Exhibit 5**).

84. On June 25, 2012, Beverly Neth, Director of the Nebraska Department of Motor Vehicles sent Defendant Cross-Sell LL.C., a notice letter terminating Defendant Cross-Sell L.L.C.'s  access to Nebraska motor vehicle records stating, "The Nebraska DMV received a solicitation from a marketing firm from a record seeded into data purchased by Cross-Sell", (**See Exhibit 6**). Extensive communications then took place after this date between representatives of Dominion Enterprises, Inc, d/b/a Cross-Sell (Defendant Cross-Sell L.L.C.) and the Nebraska Department of Motor Vehicles regarding the DPPA violations, communications remarkably similar to exchanges that took place when the initial contract was terminated in 2008, (**See Exhibit 7**).

85. Defendant Cross-Sell LL.C. once again requested reinstatement of the Nebraska Department of Motor Vehicles contract to obtain the motor vehicle records. An email communication between Betty Johnson, Administrator of the Driver and Vehicle Records Division, Beverly Neth, Director of the Nebraska Department of Motor Vehicles, and Noelie Sherdon, Nebraska Department of Motor Vehicles' Legal Counsel discussed offering the motor vehicle records with "NO" personal information (emphasis in original). Defendant Cross-Sell L.L.C.'s GM noted that the company's "current mode of operation" with states was to request/receive non-personal data only, (**See Exhibit 8**). This claim though by the Defendant Cross-Sell L.L.C.'s GM that there was a new mode of operation nationwide was not supported, IE, Defendant

Cross-Sell L.L.C. did not agree to sign the "FIRST ADDENDUM to AGREEMENT between the NEBRASKA DEPARTMENT OF MOTOR VEHICLES and CROSS-SELL L.L.C.," which limited amongst other data elements, being provided the names and addresses of individual persons that are identified as "PREVIOUS OWNER NAME", (**See Exhibit 9**) .Such was a telltale sign of the actual uses of the data by Defendant Cross-Sell L.L.C., (emphasis added). Defendant Cross-Sell L.L.C.'s "new mode of operation nationwide" was also not evident at this time in Texas, as revealed in its June 2012 Texas contract which had no such limitations, (**See Exhibit 10**).

86. Communication on August 30, 2012 between Betty Johnson, Administrator of the Driver and Vehicle Records Division, and Susan Baker, IT manager with Cross-Sell/ Dominion Dealer Solutions which revealed that Defendant Cross-Sell L.L.C., had apparently changed its interest in obtaining the motor vehicle records with the limited data element, and provided examples of how its reports would now comply with federal and state regulations, albeit the use to identify the dealer would now have a dealer code. Mrs. Johnson response on September 5, 2012 revealed the data provided did not, and apparently never did, identify the identity of dealers, (emphasis added). (**See Exhibit 11**).

87. On October 23, 2012, four months (4) after receiving notice of its DPPA violations, failing to notify individuals involved of the improper use of their data, legal representatives of Dominion Enterprises, Inc, d/b/a Cross-Sell (Defendant Cross-Sell LL.C.) sent first notice to Defendant North American Vehicle Insurance Specialists, L.L.C d/b/a NAVISS, or CarSafe L.L.C., about the unauthorized use of motor vehicle record data within direct marketing letters, data derived, in whole or part, from data

sold to Defendant Cross-Sell LL.C.. Counsel's cease and desist letter noted to refrain from use of data supplied from "Cross-Sell" reports for vehicle owners "(Nebraska vehicle owners or otherwise)". This notice letter further requested, 'the identity (by name and address) of the source of the information that your organization utilized in preparing the attached direct mail solicitation". Not only had Defendant Cross-Sell L.L.C.'s actual mode of operation continued in all states it was transacting business, including Texas, it claimed it could not identify the "recipients' of the data used by Defendant North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS, and CarSafe, thus revealing a failure to investigate "Authorized Recipients" and that the claimed DPPA violations continue to date in all states of operation, (emphasis added), (**See Exhibit 12**).

88. Plaintiff Lopez received a solicitation letter from Defendant North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS, **(See** (**See Exhibit 13**);.moreover he did not have a prior commercial relationship with Defendant North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS, nor permit access to his motor vehicle records, (**See Exhibit 14**).

89. Plaintiff Laning received a solicitation letter from Defendant North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS, (**See Exhibit 15**).moreover he did not have a prior commercial relationship with Defendant North American Vehicle Insurance Specialists, LL.C d/b/a NAVISS, nor permit access to his motor vehicle records. (**See Exhibit 16**).

90. The filing of this action may also be the first notice to some Defendants, as such, the acts made the basis of this action continue to date. Based upon information and

belief, the motor vehicle records continue to be sold to a multitude of entities, and

such entities remain unaware of the monitoring procedures attached to such motor

vehicle records, the identity of any and all "seeded" data.

**D.  Defendants Cross-Sell L.L.C. had a duty to exercise reasonable care as "Resellers", prior to release of Motor Vehicles Records obtained from State DMVs.**

91. The legislative history of the DPPA makes it clear that it incorporated "the intentions

of the 1972 Privacy Act…[And also] include[d] the recommendations of the 1977

Privacy Protection Study Commission [(PPSC")] report." The goal was to prohibit

disclosure of "records" collected and maintained by a Government agency, expect

under permissible circumstances. See 5 U.S.C. § 552a (b). The PPSC report

recommended that third party record holders be held to the "same standard" as the

Government in order to ensure compliance with the important statutory protections.

Personal Privacy is an Information Society: The Report of the Privacy Protection Study

Commission Ch. 13 (July 1977).

92. This literal reading of the DPPA was designed to promote public safety and to protect

individual privacy, construed so as to maximize their deterrent effect – in particular,

by shifting burdens to institutional actors who regularly engage in the targeted

conduct or are otherwise in a position to minimize future violations.

93. Congress intended the states to be the "gatekeepers" of the motor vehicle records,

limiting the number of people with access to the personal information because the

greater the number of people with access, the greater the risk that personal

information will be disseminated to those who do not have valid uses for the personal

information.

94. Recognizing the threat caused by unfettered access to individuals' Personal Identifiable Information ("PII") obtained from motor vehicle records, and seeking to balance that concern against the legitimate need of certain parties to have access to DMV records, Congress determined that those records should not be disclosed except to those with a legitimate need for them. It embodied that intent in a statutory scheme designed to carefully limit the uses for which such information may be disclosed. 18 U.S.C. § 2721(b). Congress made clear its intent that the burden of ensuring the permissibility of disclosures be borne by "Authorized Recipients" by imposing a record keeping obligation on them to maintain a list of not only the people to whom they disclosed the data, but also for what purpose the disclosure was made. 18 U.S.C. § 2721(c). The liability provisions of the DPPA are to be interpreted as imposing an affirmative obligation on resellers to determine the true purpose of the "Authorized Recipients."

95. In each sentence of section 2721(c) Congress linked the term "Authorized Recipient" to the specific section of 2721(b) that had authorized the release of the information to the recipient. Congress intended that the "Authorized Recipients" to be individuals, entities, or their agents, qualified to receive the information by the terms of section 2721(b). Resellers cannot obtain all of the personal information in the database simply by calling themselves resellers. Entities requesting motor vehicle records have to justify their receipt of personal information under the 2721(b) exception is applicable. Defendants were not "Authorized Recipients."

96. The United States Supreme Court analyzed the DPPA's use of "Authorized Recipient" (albeit in dicta) in *Reno v. Condon*, noting a person must have initially obtained the

data for an permissible purpose before resale or dissemination of the data:

After listing section 2721(b)'s fourteen permissible purposes, Chief Justice Rehnquist equated authorized recipients under section 2721(c) with "private persons who have obtained drivers' personal information for one of the aforementioned permissible purposes to further disclose that information for any one of those purposes." This is also the most logical conclusion based on the language of the DPPA, the purpose of the statute, the legislative history, and common sense.(quoting *Reno v. Condon*, 528 U.S. at 146 (citing 18 U.S.C. §2721(c)).

97. To ensure that the privacy of driver records is adequately protected under the DPPA, it was necessary to impose a high standard of duty for resellers when the records they sell are subsequently used for impermissible purposes, due in part because an industry of "resellers" had arisen to facilitate acquisition by end-users of information collected by State Motor Vehicle Bureaus. As the reseller is in the best position to determine whether the subsequent use of the data would be permissible under the Act, it is the reseller that must bear the burden of ensuring that an impermissible use does not occur and must investigate to determine if entities requesting the motor vehicle records have a DPPA permissible purpose. The state agency ceases to be the custodian of the data once it is obtained by the reseller; the reseller must therefore assume the responsibility and the liability for the subsequent use of the data resulting from its intentional resale, especially as it relates to direct marketing. The civil remedies provision would be rendered "toothless" if resellers could insulate themselves from liability based solely on conclusory representations of end users, without being required to exercise due care themselves.

98. The DPPA regulates the activity of resellers when acting as a "middleman", and places civil damage liability on the person and/or company that knowingly obtains, re-discloses, resells, and purchases the motor vehicle records for improper purposes.

99. In light of the text, structure, and legislative history of the DPPA, resellers are subject to a duty of reasonable care before disclosing DPPA-protected personal information, 18 U.S.C. §2721(b)-(c). Resellers must exercise reasonable care in responding to requests for personal information drawn from motor vehicle records. Resellers are liable if they do not secure proof that representations made by the recipient of personal information was valid. Defendants failed to exercise such reasonable care when reselling the motor vehicle records.

100. The structure of the DPPA supports the conclusion that resellers owe a duty of reasonable care when reselling motor vehicle records to third parties. The DPPA statute uses the word "knowingly," revealing that a level of duty of care exists. The DPPA provides an award of "punitive damages upon proof of willful or reckless disregard of the law." 18 U.S.C. § 2724(b)(2); In contrast, the court may award "actual damages, but not less than liquidated damages in the amount of $2,500." 18 U.S.C. § 2724(b)(1). The actual damages provision is silent as to the degree of fault necessary to trigger liability for actual damages. If, however, as the statute suggests, punitive damages are available only for willful and reckless violations of the DPPA, then actual damages must require something less—that is, conduct that is neither willful nor reckless.

101. The structure of the DPPA, clearly indicates that the liability of a reseller of motor vehicle records is not predicated on their knowledge of the end user's actual purpose. Rather, it is the same as the end user's. That is because section 2722(a) makes no distinction between the mental state required by the person who obtains motor vehicle records and one who discloses it. Indeed, the statue on its face applies equally

to those who "obtain" and those who "disclose" Personal Identifiable Information, 18 U.S.C. § 2722(a).

102. Section 2721(c) does not suggests that a reseller may re-disclose protected information so long as its customer claims to have a permissible use. Rather, the DPPA authorizes the resale of information only if there is an actual, not just a stated, permitted use. 18 U.S.C. § 2721(c); Thus, as a purely textual matter, the DPPA indicates that a reseller who sells protected information to a client without an actual permissible purpose is liable regardless what "certifications" that client has made.

103. Resellers owe the same or similar legal duty that obligates the State Motor Vehicle Department's when releasing motor vehicle records, that is to investigate fully whether individuals or companies obtaining the motor vehicle records have a DPPA permissible purpose. As the motor vehicle records are resold, in whole or part, the likelihood of misuse grows exponentially. The DPPA provides no distinction as to obligations of the end-user, resellers, nor the State Motor Vehicle Departments, as Custodian of the motor vehicle records, *Gordon v. Softech Int'l, Inc.,* U.S., No. 13-533, *cert. den.* 1/13/14; *Arcanum Investigations, Inc. v. Gordon,* U.S., No. 13-539, *cert. den.* 1/13/14).

104. All Defendants are involved, directly or indirectly, in the Direct Marketing industry. The DPPA restricts access to motor vehicle records for Direct Marketing unless express consent is obtained. Defendants failed to obtain express consent. Subsection (b) (12) implements an important objective of the DPPA—to restrict disclosure of personal information contained in motor vehicle records to businesses for the purpose of direct marketing and solicitation. Direct marketing and solicitation presented a particular

concern not only because these activities are of the ordinary commercial sort but also because contacting an individual is an affront to privacy even beyond the fact that a large number of persons have access to the personal information. The DPPA was enacted in part to respond to the States' common practice of selling personal information to businesses that used it for marketing and solicitations. Congress chose to protect individual privacy by requiring a state DMV to obtain the license holder's express consent before permitting the disclosure, acquisition, and use of personal information for bulk solicitation.

105. To verify the eligibility to invoke the claimed DPPA permissible purpose, an entity must provide information, including but not limited to, proof relating to its business which must correspond to its claimed DPPA uses, current status, activity of the employing entity, and purported business affiliation. It is negligent if the reseller fails to make proper inquiries of the end-user, especially if "red flags" exist, and provide "red flags" requiring additional review prior to the purchase of the Plaintiffs' and Class Members' MVRs.

106. Defendant Cross-Sell, L.L.C. obtained the MVRs for a reason and with a purpose in mind when it entered into a contract with State Motor Vehicle Departments to obtain motor vehicle records. Federal Law, and State contractual duties existed, that obligated Defendant Cross-Sell, L.L.C. to obligate Cross-Sell Affiliates to use the requested MVR information for purposes permitted by the DPPA. Hence, at a minimum, Cross-Sell Affiliates ' disclosures to Defendant Cross-Sell, L.L.C. were not permitted by the DPPA permitted uses, and totally incompatible with the purpose for which the information was collected.

107. Defendant Cross-Sell, L.L.C., acting as a reseller, had an actual legal duty to perform, other than the ministerial task of soliciting rote representations from prospective requestors. Resellers must adhere to the same legal requirements as a State Department of Motor Vehicles representatives when re-releasing motor vehicle records, including but not limited to, confirming those obtaining motor vehicle records have a DPPA permissible use to obtain the motor vehicle records. This obligation is not met by a merely accepting verbatim the end user's "say-so" in the presence of "red flags" suggesting the requested information was being sought for an improper DPPA purpose. Defendant Cross-Sell, L.L.C., was well aware of Cross-Sell Affiliates' business and objectives prior to the release to them of the Plaintiffs' and Class Members' MVRs.

108. Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, acting individually and in concert with, acting as a prospective requestor of data which includes Personal Identifiable Information from Defendant Cross-Sell, L.L.C., also has a duty, other than the ministerial task of soliciting rote representations from prospective resellers that the data was not derived, in whole or part, from motor vehicle records obtained from State Motor Vehicle Departments. The prospective requesters must confirm that the resellers had a DPPA permissible use to obtain the data and to re-disclose and the resell motor vehicle records. This obligation is not met merely by accepting the reseller's "say-so" in the presence of "red flags" suggesting the requested information was obtained for a proper purpose. Research would reveal the association between Defendant Cross-Sell, L.L.C.; moreover a cursory review of Cross-Sell Affiliates website would reveal its direct marketing business, and provide

"red flags" requiring additional review prior to the purchase of the data.

109. Defendant Cross-Sell, L.L.C., had an ongoing business relationship with Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, through which Defendant Cross-Sell, L.L.C., knew, or should have known, that Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS was a Direct Marketer Provider. Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, was required to contractually agree with Defendant Cross-Sell, L.L.C. that it would only use information for purposes permitted by the DPPA. Hence, at a minimum, Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS' disclosures to Defendant Cross-Sell, L.L.C., were not permitted by the DPPA permitted uses, and totally incompatible with the purpose for which the information was collected.

110. Defendant Cross-Sell L.L.C. was legally obligated to maintain documents for five (5) years of any and all individuals and entities that obtained the motor vehicle records. Discovery shall be required to produce such documents.

111. Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, was legally obligated to certify its intended DPPA uses, and obligate them to maintain documents for five (5) years of any and all individuals and entities that obtained the motor vehicle records. Discovery shall be required to produce such documents.

112. Defendant Cross-Sell L.L.C. failed to verify the accuracy of underlying facts, purported business objectives and affiliations of Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, declining to confirm inferences of risk that existed that Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS did

not possess permissible DPPA purposes, actions best construed as deliberate

ignorance, or in the alternative, negligent.

113. Defendant Cross-Sell L.L.C. became the custodian of the motor vehicle records with a

duty to exercise reasonable care when re-disclosing or reselling motor vehicle records.

Third parties benefitted from Defendant Cross-Sell L.L.C. as the custodian.  Third

parties that did not have a contract with State Motor Vehicle Departments because

they knew State Motor Vehicle Departments would not authorize them to obtain

MVRs since they were in the Direct Marketing Industry knew it had no authority to

obtain the state motor vehicle records directly. While the contract with the State

Motor Vehicle Departments was with Defendant Cross-Sell L.L.C., for all extent and

purposes, third parties became the initial recipient of the motor vehicle records

transferred from the State Motor Vehicle Departments. Defendant Cross-Sell L.L.C.

failed in their duty as gatekeeper, failing to exercise reasonable care by allowing third

parties access to the motor vehicle records in such manner. Defendant Cross-Sell L.L.C.

failed intentionally, or in the alternative, negligently.

114. Defendant Cross-Sell L.L.C. as custodian of the motor vehicle records, was obligated

to investigate and determine whether Defendant North American Vehicle Insurance

Specialists, L.L.C., d/b/a NAVISS had a DPPA permissible use for the motor vehicle

records it sought from Defendant Cross-Sell L.L.C.; however Defendant Cross-Sell L.L.C.

knowingly, with willful and wanton disregard, or in the alternative, negligently, failed

to provide a reasonable investigation of Defendant North American Vehicle Insurance

Specialists, L.L.C., d/b/a NAVISS prior to reselling the motor vehicle records. A minimal

review by Defendant Cross-Sell L.L.C. of Defendant North American Vehicle Insurance

Specialists, L.L.C., d/b/a NAVISS' business practices would have revealed "red flags", as to its claimed DPPA permissible uses since it was a direct marketing entity.

115. This obligation exists to conduct investigative duties on resellers, using minimal safeguards in a reseller's request process. Such additional burdens in doing so impose the benefit of preventing stalking, harassment, identity theft, and other criminal acts this would be well worth the time and expense of such a burden. Defendant Cross-Sell L.L.C., knowingly, or in the alternative carelessly, failed to take reasonable basic steps to confirm the truthfulness of the stated purposes of the claimed DPPA uses by Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS. This willful or negligent blindness is not a defense to liability.

**VII.**
**DEFENDANT'S HARMFUL BUSINESS PRACTICES**

116. Defendants' activities occurred throughout the United States, obtaining the motor vehicle records of Plaintiffs and the Class Members for purposes not permitted - a course of action, and a body of information, that is protected from access and disclosure by federal law.

117. Without remedy, Plaintiffs' and Class Members' privacy will continue to be violated by Defendants and a multitude of companies affiliated with Defendants — companies they've never heard of, companies they have no relationship with, and companies they would never choose to trust with their motor vehicle records.

118. The obtainment, re-disclosure, and resale of Plaintiffs' and Class Members' motor vehicle records by Defendants implicates Plaintiffs' and Class Members' privacy, risk of identity theft, and security risk. Such information is afforded special attention due to

the consequences that may flow from its disclosure. The heightened privacy concerns

generated by obtaining, re-disclosing, and reselling such information, without

authorization, is apparent in U.S. law, creating restrictive consent standards for its

obtainment, re-disclosure, and resale.

119. Defendants have, either directly, or by aiding, abetting, and/or conspiring to do so,

willfully, knowingly, negligently, or recklessly, disclosed, exploited, misappropriated

and/or engaged in widespread commercial usage of Plaintiffs' and the Class Members'

motor vehicle records, obtaining personal information for Defendants' own benefit,

without legal authorization, and without Plaintiffs' and Class Members' knowledge,

authorization, or consent. Such conduct constitutes a highly offensive and dangerous

invasion of Plaintiffs' and the Class Members' privacy.

120. Defendants knowingly obtained, disclosed, and/or re-sold Plaintiffs and Class

Members personal information, data derived from motor vehicle records in whole or

part, for uses not permitted legally, a violation of a federal law which afforded

statutory protections.

121. At all times material, Defendants, and agents of the Defendants, knew, or reasonably

should have known, that their actions violated clearly established statutory rights of

the Plaintiffs and the Class members.

122. The individual Defendants knowingly authorized, directed, ratified, approved,

acquiesced in, committed or participated in disclosing Plaintiffs' and the Class

members' highly restricted personal information.

123. The individual Defendants were aware that such a disclosure of Plaintiffs' and the

Class members' highly restricted personal information, without the express consent of

the person to whom the information pertained, was an invasion of privacy in violation of the DPPA.

124. Plaintiffs and Class Members were harmed when Defendants intentionally, or in the alternative, negligently, obtained, processed, disseminated, stored, and used motor vehicle records to market and solicit Plaintiffs' and Class Members', obtained without authorization, and invading their right of privacy.

125. Defendants' conduct caused harm to Plaintiffs' and Class Members' privacy expectations.

126. Defendants were not authorized to have free access to Plaintiffs' and Class Members' motor vehicle records for purposes unrelated to Defendants' claimed DPPA purpose when initially obtaining the motor vehicle records from the state.

127. Defendants failed to acquire, independently, and in concert, the express consent, of Plaintiffs and Class Members before obtaining, collecting, generating, deriving, disseminating, storing, or causing to be stored, re-disclosing or purchasing the MVR data of Plaintiffs and Class Members.

128. Third parties associated with Defendants that accessed Plaintiffs' and Class Members' motor vehicle records failed to provide notice of any and all of its activities, any and all uses of the motor vehicle records, present location of all motor vehicle records, and the identity of parties that accessed such motor vehicle records.

129. The Defendants accessed MVR data which included information about children that qualify to obtain a driver's license and/or register a motor vehicle, failing to distinguish personal data about children ages 18 and under from personal data about adults.

130. The Defendants failed to maintain adequate policies, practices, and procedures

relating to the re-disclosure and resale to third parties obtaining the Plaintiffs' and Class Members' motor vehicle records.

131. The Defendants failed to monitor compliance regarding the conditions of use between third parties involved in the re-disclosure, and resale of Plaintiffs' and Class Members' motor vehicle records, failing to enumerate prohibitions and restrictions on access to the motor vehicle records.

132. Defendants used, or permitted to be used, false and misleading advertisements, derived from the data within Plaintiffs' and Class Members' motor vehicle records, in a marketing and solicitation exploit, sending a deceptive mailer which included false statements advising Plaintiffs and Class Members that their auto warranties had expired, or were about to expire, creating a sense of urgency by claiming the offering period was limited, mailing such in an envelope which appeared to be state official business.

133. Defendants' activities alleged herein in parts constituted a knowing scheme to defraud Plaintiffs and the Class Members, and to wrongfully access and retain Plaintiffs' and Class Members' motor vehicle records.

134. In the course of committing the acts described above, Defendants intentionally accessed, on a repetitive basis, and without authorization, documents, derived in whole or part, from government facilities, in order to obtain Plaintiffs' and Class Members' motor vehicle records, intentionally exceeding access authorization, obtaining, and using Plaintiffs' and Class Members' motor vehicle records for impermissible purposes.

135. Harms and damages to Plaintiffs and the Class Members occurred during the class

period set forth in the factual allegations herein and continue to the present, as a consequence of Defendants' conduct in harvesting Plaintiffs' and Class Members' motor vehicle records.

136. Further, through its practices, Defendants have been able to raise its profile as possessing motor vehicle records with many companies, enabling Defendants to attract business, increase its prospective revenue, secure investment funding, and thereby profit from its conduct described herein.

137. On information and belief, Plaintiffs' and Class Members' motor vehicle records were transmitted between Defendants and other third parties, more than likely through electronic communications, "in the clear" (sometimes referred to as "plain text"): that is, without adequate encryption, thus exposing access by unknown parties. Defendants' transmission of motor vehicle records "in the clear," was substandard in light of reasonably accepted security measures that are well understood to be associated with such poorly secured transmission and exposing each Plaintiff to additional unreasonable risks of the interception of their motor vehicle records. Such unsecured transmissions were particularly inappropriate given the nature of technology through which such information were transmitted.

138. The Defendants acquired Plaintiffs' and Class Members' motor vehicle records that were unnecessary to motor vehicle records stated functions, but were useful to the Defendants in their commercial compilation, and use of the data derived from the motor vehicle records. With the motor vehicle records acquired, the Defendants used the information to compile—in addition to the types of information—information that included consumers' personal characteristics.

139. During the Class Period, each Plaintiff named herein had personal motor vehicle records obtained, used, re-disclosed, stored, resold, and purchased for purposes that included marketing and solicitation, without their express consent. Such data was identifiable as to each of the Plaintiffs and Class Members and were transmitted to third parties for purposes wholly unrelated to its use and functionality when Plaintiffs and Class Members produced such to the state.

**VIII.**
**CLASS ALLEGATIONS**

140.   Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek certification of the following classes (collectively, the "Classes"):

1.   **NATIONWIDE CLASS:** All persons in the United States who, on or after, four (4) years prior to the date of this filed complaint, through the final disposition of this or any related actions (the "Class Period"), had CROSS-SELL, L.L.C., and NORTH AMERICAN VEHICLE INSURANCE SPECIALISTS, L.L.C., d/b/a NAVISS, obtain, directly or indirectly, their motor vehicle records from their State Department of Motor Vehicles, to re-disclose, and/or resell, for direct marketing purposes, without express consent.

141. Excluded from the class are the Defendants, its employees, officers, directors, agent, legal representatives, heirs, assigns, successors, individual or corporate entities acting within a partnership, joint venture, trust, association, union, subsidiaries, whether wholly or partially owned, divisions, whether incorporated or not, affiliates, branches, joint ventures, franchises, operations under assumed names, websites, and entities over which Defendants' exercises supervision or control, or group of individuals associated in fact, although not a legal entity, or other legal entity, in addition to Plaintiffs' legal counsel, employees, and their immediate family, the judicial officers and their immediate family, and associated court staff assigned to this case, and all persons within the third degree of consanguinity, to any such persons.

142. Plaintiffs reserve the right to revise these definitions of the classes based on facts they learn as litigation progresses.

143. The Class consists of millions, if not tens of millions, of individuals and other entities, making joinder impractical.

144. The members of the Class are identifiable from the information and records in the custody of the Defendants identified in the Class definition, and the State Motor Vehicle Department which provided motor vehicle records to Defendant Cross-Sell L.L.C..

145. Defendants' conduct, as complained of herein, is generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

146. The claims of Plaintiffs are typical of the claims of all other Class Members.

147. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have suffered damages in their own capacity from the practices complained of, in that their personal information or highly restricted personal information has been unlawfully obtained, disclosed, and sold for a profit, and is ready, willing, and able, to serve as Class representatives.

148. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest that might cause them not to vigorously pursue this action. Plaintiffs' have retained counsel with substantial experience in prosecuting complex litigation and class actions involving unlawful commercial practices, including, but not limited to, the following Federal Privacy Class Actions:

1. Lane *v*. *Facebook*, *Inc*., *696 F.3d 811, 821* (*9thCir. 2012*) *cert*. *denied*, *13-136, 2013 WL 5878083*(*U.S. Nov*. 4, 2013), a Federal Class Action, decided by the United States Supreme Court,  involving similar underlying facts as the present action, about 30 companies, violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, *et seq*.;

2. Cross v. Blank, Adv. No.: 9:15-ap00926-FMD, (M.D. Fla. 2015), a Federal

Class Action involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"),18 U.S.C. § 2721, *et seq.*;

3. Cook v. ACS State & Local Solutions, Inc. 663 F.3d 989 (10th Cir. 2011), a Federal Class Action involving similar underlying facts as the present actions violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*;

4. Doe et. al. v. Compact Information Systems Inc. et al., 3:13-cv-05013-M-BH, (N.D. Tex. 2013),  a Federal Class Action involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*;

5. Haney v. Recall Center, No 10-cv-04003 (W.D. Ark. May 9, 2012) a Federal Class Action, (certified), involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*;

6. Richard Fresco v. R.L. Polk., No. 09-13344 (11th Cir. 2010), (Fresco II"-Intervention), a Federal Class Action  involving similar underlying facts as the present action, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*;

7. Sharon Taylor et al. v. Acxiom Corporation et al., 2:0-cv-0001, (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*;

8.  Sharon Taylor et. al. v. ACS State & Local Solutions, Inc. et. al., 2:07-cv-0013, (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*;

9.  Sharon Taylor et. al. v. Texas Farm Bureau Mutual Insurance Company et.al., 2:07-cv-0014, (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq*;

10. Sharon Taylor et. al. v. Safeway Inc. et. al., 2:07-cv-0017, (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*;

11. Sharon Taylor et. al. v. Biometric Access Company et. al., 2:07-cv-0018,

(E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*;

12.  Sharon Taylor et. al. v. Freeman Publishers Inc., 2:07-cv-0410,' (E.D. Tex. 2007), a Federal Class Action involving similar underlying facts as the present action, about 50 companies, violations of the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721, *et seq.*.

149. A class action will cause an orderly and expeditious administration of Class Members' claims and economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured. Individual Class Members are unlikely to be aware of their rights and are not likely to be in a position (either through experience or financially) to commence individual litigation against Defendants.

150. Absent a class action, most Class Members would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

151. The Defendant has acted and failed to act on grounds generally applicable to Plaintiffs and all of the other Class Members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members.

152. The factual and legal basis of Defendants' liability to Plaintiffs, and to the other Class Members are the same, resulted in injury to Plaintiffs and all of the other Class Members. Plaintiffs and the other Class Members have all suffered harm and damages as a result of Defendants' wrongful conduct.

153. Certification of a class under Fed. R. Civ. P. 23 is appropriate because Plaintiffs and the putative Class Members have questions of law and fact that are common to the Class that predominate over any questions affecting only individual members of the Class, and a class action is superior to all other available methods for fair and efficient adjudication of this controversy in fact, the wrongs suffered and remedies sought by Plaintiffs and the other members of the Class are premised upon an unlawful scheme participated in by Defendants.

154. There are many questions of law and fact common to Plaintiffs and the Class Members, and those questions predominate over any questions that may affect individual Class Members. Common questions for the Class include, but are not limited to the following:

1. whether Defendant Cross-Sell, L.L.C. obtained, re-disclosed, and/or resold Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

2. whether Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS obtained, re-disclosed, and/or resold Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

3. whether Defendant Cross-Sell, L.L.C. had a DPPA permissible use to obtain, re-disclose, and/or resell Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

4. whether Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS had a DPPA permissible use to obtain, re-disclose, and/or resell Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

5. whether Defendant Cross-Sell, L.L.C. obtained the written express consent of Plaintiffs and Class Members to obtain, re-disclose, and/or resell Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

6. whether Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS obtained the written express consent of Plaintiffs and Class Members to obtain, re-disclose, and/or resell Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

7. whether Defendant Cross-Sell, L.L.C. acted knowingly when it obtained, re-disclosed, and/or resold Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

8. whether Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS acted knowingly when it obtained, re-disclosed, and/or resold Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments;

9. whether Defendant Cross-Sell, L.L.C.'s conduct described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

10. whether Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS' conduct  described herein violates the Driver's Privacy Protection Act, 18 U.S.C. §2721;

11. whether Defendant Cross-Sell, L.L.C., as custodian of the Plaintiffs' and Class Members' motor vehicle records, possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by  Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and Cross-Sell Affiliates, prior to, during, and after, re-disclosing, and/or re-selling Plaintiffs' and Class Members' motor vehicle records to such entities by permitting procurement, re-disclosure, and re-sale of the Plaintiffs' and Class Members' motor vehicle records by such entities, and if so, whether Defendant Cross-Sell, L.L.C. intentionally, or in the alternative, negligently failed in this obligation;

12. whether Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and Cross-Sell Affiliates, as recipients of the Plaintiffs' and Class Members' motor vehicle records from Defendant Cross-Sell, L.L.C., possessed a duty to use reasonable care to investigate and determine the validity of the claimed DPPA permissible uses by  Defendant Cross-Sell, L.L.C. used to obtain the motor vehicle records from the State Department of Motor Vehicles, prior to, during, and after, obtaining Plaintiffs and Class Members' motor vehicle records, and if so, whether Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS intentionally, or in the alternative, negligently failed in this obligation;

13. whether Defendant Cross-Sell, L.L.C. complied with 18 U.S.C.  §2721 (c), the

obligation to maintain a record of any person and/or company that Defendant Cross-Sell, L.L.C. re-disclosed, and /or resold Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments for a period of five (5) years; and if so, whether Defendant Cross-Sell, L.L.C. intentionally, or in the alternative, negligently failed in this obligation;

14. whether Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS complied with 18 U.S.C. §2721 (c), the obligation to maintain a record of any person and/or company that Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS re-disclosed, and /or resold Plaintiffs and Class Member's personal information contained within motor vehicle records maintained by the State motor vehicle departments for a period of five (5) years; and if so, whether Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS intentionally, or in the alternative, negligently failed in this obligation;

15. the nature, and extent of Plaintiffs' and Class Members' damages;

16. the nature, and extent of all statutory penalties, including liquidated damages of $2500.00, and/ or damages for which Defendant Cross-Sell, L.L.C., is liable for, and legally obligated to, Plaintiffs and Class Members;

17. the nature, and extent of all statutory penalties, including liquidated damages of $2500.00, and/ or damages for which Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS is liable for, and legally obligated to, Plaintiffs and Class Members;

18. whether  Plaintiffs and Class Members are entitled to appropriate injunctive relief against Defendant Cross-Sell, L.L.C.,

19. whether Plaintiffs and Class Members are entitled to appropriate injunctive relief against Defendant North America Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and

20. whether punitive damages are appropriate.

155. The questions of law and fact common to Class Members predominate over any questions affecting only individual members; and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

**COUNT I**

**Violations of the Driver's Privacy Protection Act, § 18 U.S.C. § 2721 et seq.:**
**On Behalf of All Classes, and against All Defendants**

156. Plaintiffs incorporate by reference and re-allege all paragraphs previously alleged herein.

157. As set forth herein, Defendants violated the Driver's Privacy Protection Act, 18 U.S.C. § 2721, by engaging in the acts alleged in this complaint.

158. The Driver's Privacy Protection Act, 18 U.S.C. §2721 (a) et seq., regulates obtaining and disclosing personal information gathered by State Departments of Motor Vehicles, making it unlawful for a person or organization from knowingly obtaining or disclosing personal information, or highly restricted personal information contained in motor vehicle records for any purpose not specifically enumerated under §2721(b).

159. Accordingly, Defendants violated 18 U.S.C. §2721 et seq. by intentionally obtaining, re-disclosing, and/or re-selling Plaintiffs' and Class Members' motor vehicle records without knowledge, consent, or authorization, for purposes not specifically enumerated with the act.

160. Plaintiffs and Class Members are "person[s] referencing" "an individual, organization, or entity, but does not include a State or agency thereof", within the meaning of 18 U.S.C. §2725(2).

161. 18 U.S.C. § 2724(a) prohibits the release and disclosure of personal information, as defined in 18 U.S.C. § 2725(3) about an individual obtained by the State Motor Vehicle Department except as provided in subsection (b), permissible uses, regulates the prohibition on release and use of certain personal information from State motor

vehicle records.

162. 18 U.S.C. §2725(3) "personal information" means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the five (5) digit zip code), telephone number, and medical or disability information; but does not include information on vehicular accidents, driving violations, and driver's status.

163. The contents of the records obtained by Defendants pertaining to the Plaintiffs and Class Members constitute a "motor vehicle record", referencing "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles", within the meaning of 18 U.S.C. §2725(1).

164. 18 U.S.C. § 2722(b), prohibits any organization or entity from making any false representation to obtain any personal information or highly restricted personal information from an individual's motor vehicle record.

165. Defendants violated 18 U.S.C. §2721 (b), individually, and in concert, by making false representations to knowingly obtain the Plaintiffs' and Class Members' motor vehicle records, directly or indirectly, for Direct Marketing purposes, knowingly, or in the alternative, providing for use in marketing and solicitation Plaintiffs and Class Members, without their express consent.

166. 18 U.S.C. §2725(5) "express consent" means consent in writing, including consent conveyed electronically that bears an electronic signature as defined in section 106(5) of Public Law 106–229.

167. 18 U.S.C. § 2721(c), permits an "Authorized Recipient" of personal information (except for some exceptions) to re-disclose and/or re-sell the information, but only for a claimed use permitted under 18 U.S.C. § 2721(b). Defendants Cross-Sell, L.L.C., and Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS were not Authorized Recipients, thereby violating 18 U.S.C. § 2721(c).

168. Defendant Cross-Sell, L.L.C. violated 18 U.S.C. § 2721(c) by re-disclosing and/or re-selling Plaintiffs' and Class Members' information to Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS, and Cross-Sell Affiliates,  non-Authorized Recipients.

169. Defendant Cross-Sell, L.L.C. is liable directly and/or vicariously for re-disclosure and resale to Cross-Sell Affiliates, failing to use reasonable care to investigate Cross-Sell Affiliate's claimed DPPA permissible uses when re-disclosing and/or re-selling Plaintiffs' and Class Members' motor vehicle records to such entities.

170.  18 U.S.C. § 2722(b)(12), prohibits the use of motor vehicle records for bulk distribution for surveys, marketing or solicitations unless the State has obtained the express consent of the person to whom such personal information pertains. Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS violated 18 U.S.C. § 2722(b)(12) by obtaining, re-disclosing, and/or re-selling the motor vehicle records for purposes that include direct marketing, without the express consent of Plaintiffs and Class Members.

171. Defendant North American Vehicle Insurance Specialists, L.L.C., d/b/a NAVISS and Cross-Sell Affiliates, violated 18 U.S.C. § 2721(c) as recipients of the Plaintiffs' and Class Members' motor vehicle records from Defendant Cross-Sell, L.L.C., failing to use

reasonable care to investigate and determine the validity of the claimed DPPA

permissible uses by  Defendant Cross-Sell, L.L.C. used to obtain the motor vehicle

records from the State Department of Motor Vehicles, prior to, during, and after,

obtaining Plaintiffs' and Class Members' motor vehicle records.

172. Plaintiffs and the Class have suffered damages, as alleged herein, and pursuant to 18

U.S.C. § 2724(b)(1), are entitled to actual damages, but not less than liquidated

damages in the amount of $2,500 each.

173. Plaintiffs and the Class, pursuant to 18 U.S.C. § 2724(b)(1), are entitled to

preliminary, equitable, and declaratory relief, in addition to statutory damages of the

greater of money, actual and punitive damages, reasonable attorneys' fees, and

Defendants' profits obtained from the above-described violations. Unless restrained

and enjoined, Defendants will continue to commit such acts. Plaintiffs remedy at law is

not adequate to compensate him for these inflicted and threatened injuries, entitling

Plaintiffs to remedies including injunctive relief as provided by 18 U.S.C. § 2724(b)(1).

174. As a direct and proximate result of the aforesaid acts and activities of Defendants,

Plaintiffs, and each of them, have been caused to sustain harm.

175. All of the acts and activities of Defendants, as heretofore set out, were performed

intentionally, fraudulently, maliciously, knowingly, conspiratorially, and on occasion,

negligently.

176. Plaintiffs and Class Members were damaged thereby, and seek redress thereof.

**PRAYER FOR RELIEF**

 **WHEREFORE**, Plaintiffs, individually, and on behalf of all others similarly situated,

respectfully prays for judgment against Defendants as follows:

a) For an order certifying that this action may be maintained as a class action under Fed. R. Civ. P. 23(a) and (b)(1)(a), (b)(2), and (b)(3);

b) For an order designating Plaintiffs and their counsel as representatives of the Class;

c) For a declaration that Defendants' actions violated the Federal Driver's Privacy Protection Act, 18 U.S.C. §2721, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendants' violations of the DPPA, but not less than liquidated damages in the amount of $2,500 for each Plaintiff and each member of the Class;

d) As applicable to the Class mutatis mutandis, awarding injunctive and equitable relief including, inter alia: (i) prohibiting Defendants from engaging in the acts alleged above; (ii) requiring Defendants to disgorge all of its ill-gotten gains to Plaintiffs and the other Class Members motor vehicle records, or to whomever the Court deems appropriate; (iii) requiring Defendants to delete all motor vehicle records collected through the acts alleged above; (iv) awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendants by means of the wrongful conduct alleged herein; and (v) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendants;

e) For a preliminary and permanent injunction restraining Defendants, its officers, agents, servants, employees, and attorneys, and those in active concert or participation with any of them from:

   1. Obtaining, directly or indirectly, Plaintiffs' and Class Members' Motor Vehicle Records, without express consent,  from the State Motor Vehicle Department, for purposes that violate the Driver's Privacy Protection Act;

   2. Re-disclosing Plaintiffs' and Class Members' motor vehicle records for purposes that violate the DPPA;

   3. Reselling Plaintiffs' and Class Members' motor vehicle records for purposes that violate DPPA;

f) A permanent injunction enjoining and restraining Defendants, and all persons or entities acting in concert with them during the pendency of this action and thereafter perpetually, from:

   1. Obtaining, directly or indirectly, Plaintiffs' and Class Members' Motor Vehicle Records, derived in whole or part, from data maintained by their

State Motor Vehicle Department, for purposes that violate the Driver's Privacy Protection Act;

2. Using, processing, and disseminating, Plaintiffs' and Class Members' motor vehicle records for purposes that violate the DPPA;

3. Re-disclosing by reselling Plaintiffs' and Class Members' motor vehicle records for purposes that violate DPPA;

4. Using, directly or indirectly, Plaintiffs' and Class Members' motor vehicle records to conduct direct marketing on Plaintiffs and Class Members, without their express consent, for purposes that violate the DPPA.

g)  For an award to Plaintiff and the Class of their costs and expenses of this litigation;

h)  For an award to Plaintiff and the Class for their reasonable attorneys' fees;

i)  An award to Class Members of damages, including but not limited to: compensatory, statutory, exemplary, aggravated, and punitive damages, as permitted by law and in such amounts to be proven at trial;

j)  For pre-and post-judgment interest as allowed by law; and

k)  For such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.


Dated: July 8, 2016                    Respectfully submitted,
                                       **LAW OFFICES OF JOSEPH H. MALLEY P.C.**


                                       By: _/s/ Joseph H. Malley_
                                       Law Office of Joseph H. Malley P.C.
                                       1045 North Zang Blvd
                                       Dallas, TX 75208
                                       Telephone: 214.943.6100
                                       Facsimile: 214. 943.6170
                                       malleylaw@gmail.com

                                       Attorney for Plaintiffs Arthur Lopez, and
                                       Mark Laning, individually, and on behalf of a
                                       class of similarly situated individuals